John F. **ROBINSON**, Trustee For the Francis E. Heydt Company, Appellant,

v.

Richard **CHENEY**, Secretary, U.S. Department of Defense, et al.

No. 88–5126.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1989.

Decided May 23, 1989.

---

Timothy Sullivan, Washington, D.C., for appellant.

Charles Flynn, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, Washington, D.C., and R. Craig Laurence, Asst. U.S. Attys., were on the brief, for appellees.

Before STARR, WILLIAMS, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

On December 24, 1987, the Defense Logistics Agency (DLA) debarred the Francis E. Heydt Company (FHC), a manufacturer of military apparel, from bidding on any contract or subcontract with any agency in the Executive Branch until September 29, 1990. John H. Robinson, trustee for FHC, brought this action in the district court challenging the DLA's order as arbitrary, capricious, and an abuse of discretion and the regulation pursuant to which it was issued as unconstitutional. The district court, Revercomb, J., granted the Government's motion for summary judgment and dismissed the action with prejudice. We affirm in all respects.

## I. LEGAL FRAMEWORK

Under the Armed Forces Procurement Act of 1948, military agencies are generally required, in preparing for the procurement of property or services, to solicit bids or proposals and develop specifications in a manner designed to achieve "full and open competition," 10 U.S.C. § 2305(a)(1)(A)(i) & (iii), and to award bids only to "responsible" bidders, 10 U.S.C. § 2305(b)(1), (3). A bidder is responsible if, among other things, it "has a satisfactory record of integrity and business ethics." 10 U.S.C. § 2302(3); 41 U.S.C. § 403(8)(D).

The Federal Acquisition Regulations (FAR), which implement these statutory standards, permit an agency, for cause, to prohibit a contractor from bidding on government contracts or subcontracts for a period generally not to exceed three years. This sanction of "debarment" is to be imposed "only in the public interest for the Government's protection and not for purposes of punishment." 48 C.F.R. § 9.402(b).

Under the FAR, an agency may debar a contractor that has been convicted of, or is the subject of a civil judgment for, (1) fraud in connection with obtaining, attempting to obtain, or performing a government contract; (2) a violation of federal or state antitrust law; (3) embezzlement, theft, bribery, falsification of records, making false statements, or receiv-ing stolen property; or (4) any other offense that indicates a lack of business integrity that directly and seriously affects its present responsibility as a government contractor. 48 C.F.R. § 9.406–2(a). A government agency may also debar a contractor if it finds "[a]ny other cause of so serious or compelling a nature that it affects the present responsibility" of the company. 48 C.F.R. § 9.406–2(c). In order to act under the latter standard, the agency must prove the "other cause" for debarment by a preponderance of the evidence, 48 C.F.R. § 9.406–3(d)(3), which the FAR define as "proof by information that, compared with that opposing it, leads to the conclusion that the fact at issue is more probably true than not." 48 C.F.R. § 9.403.

The FAR permit an agency to impute to a contractor the "seriously improper conduct of any officer, director, shareholder, partner, employee, or other individual associated with [the] contractor ... when the conduct occurred in connection with the individual's performance of duties for or on behalf of the contractor, or with the contractor's knowledge, approval, or acquiescence." 48 C.F.R. § 9.406–5(a). An agency may also extend a debarment order to any affiliate of a debarred contractor. 48 C.F.R. § 9.406–1(b). "Business concerns or individuals are affiliates if, directly or indirectly ... one controls or can control the other...." 48 C.F.R. § 9.043.

An agency proposing debarment must "afford the contractor ... an opportunity to submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment." 48 C.F.R. § 9.406–3(b). If the agency finds that the contractor's submissions raise a genuine issue of fact material to the proposed debarment, it must also "[a]fford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents...." 48 C.F.R. § 9.406–3(b)(2)(i). Otherwise, the agency may make a decision on the basis of all information in the record, including any

information submitted by the contractor. 48 C.F.R. § 9.406–3(d)(2)(i).

The parties are in accord that the agency's decision is subject to judicial review under the standards set forth in § 706(2)(A) of the Administrative Procedure Act, *see* 5 U.S.C. § 706(2)(A) ("reviewing court shall ... hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971), and we proceed accordingly.

## II. BACKGROUND

In February 1987, a grand jury indicted a number of military clothing suppliers doing business with the Defense Personnel Support Center in Philadelphia (DPSC), along with several DPSC employees and former employees. Neither FHC nor Francis E. Heydt, who owns all of the stock in FHC, was indicted, but one of the indicted government employees, Donald F. Sherry, made statements to the government investigator that implicated Heydt. According to Sherry, Heydt (1) orchestrated the bids of five suppliers, three of which he controlled, on a contract for camouflage pants; and (2) paid Sherry $10,000, in two $5,000 installments, for his help in directing the contract to FHC.

During the summer of 1987, Heydt learned that the DLA was considering debarring both him and FHC. On the advice of counsel, Heydt executed an irrevocable trust agreement whereby he transferred to Robinson, as trustee, all of his right, title, and interest in the assets of FHC. The agreement empowers Robinson to manage the company, and directs him to distribute to Heydt, on a quarterly basis, all after-tax income of the trust and to retain all principal "unless [he] considers it necessary to distribute such principal to or for the benefit of [Heydt] for support, maintenance, or medical care that cannot be provided from the net accounting income of the Trust and any other financial resources available to [Heydt]." Unless extended by Heydt, the trust terminates in January 1992 or when FHC either ceases to do business as a manufacturer of military apparel or receives a determination from the DLA that it will not debar the company, whichever is earlier. Upon termination, the trustee is to distribute all of its assets to Heydt.

In late September 1987, the DPSC notified FHC that it had recommended that the DLA debar the company, and that it would therefore disregard a bid that FHC had submitted earlier that month. In response, FHC delivered to DPSC and to the DLA a copy of the trust agreement between Heydt and Robinson, along with a letter offering to answer any questions relating to the trust. Nonetheless, on September 30, 1987, the DLA notified FHC that it had initiated debarment proceedings based upon "information ... indicat[ing] that FHC lacks the business integrity and present responsibility to be a Government contractor...."

An explanatory memorandum, enclosed with the notice of proposed debarment, detailed the information provided by Sherry and, based thereon, charged that (1) Heydt participated in a scheme to make improper payments to a government official and to circumvent free and open competition for the award of a public contract; and (2) FHC and the other bidders on the contract participated in a scheme to circumvent free and open competition; and concluded that (3) Heydt's conduct would be imputed to FHC because it occurred in connection with his performance of his duties for or on behalf of FHC, or with the company's knowledge, approval, or acquiescence; and (4) FHC could be debarred as an affiliate of Heydt because, as the founder of, and as the owner of an equitable interest in, FHC, Heydt "does or can control FHC, either directly or indirectly...." The notice further provided:

Within thirty calendar days after receipt of this notice, a representative on FHC's behalf may submit, either in person or in writing, information and argument in opposition to the proposed debarment, including any additional specific information that raises a genuine dispute over

facts material to the proposed debarment. If it is found that the information or argument submitted raises a genuine dispute over material facts, factfinding will be conducted to determine the disputed facts.

On October 20, FHC's counsel submitted to the DLA another copy of the trust agreement, along with the affidavits of Robinson, as trustee, and of four management employees of the company. In his affidavit, Robinson summarized his experience (principally as a banker), noted that his prior contact with Heydt had been limited and arm's-length, and summarized his current dealings with Heydt as follows:

Mr. Heydt explained to me before the trust was executed that he could no longer have any dealings with the company, and he has kept his distance.... While I have no direct experience in the textile and apparel industry, my general experience as a businessman and banker have aided me greatly in learning about this business at a rapid pace. I rely heavily on the staff that I have inherited from Mr. Heydt, and together we are able to run this business in a very able manner.

In her affidavit, Evelyn Bale, the executive assistant to Robinson (and previously to Heydt), stated:

I am not aware of any facts which relate to the Defense Logistics Agency's allegation that Mr. Heydt improperly orchestrated bids in connection with [the contract for camouflage pants]. As with all of the company's bids, I was directly involved in the preparation of the Francis E. Heydt Company's bid on that solicitation. I did not provide any information or assistance to representatives of [the other bidders], and I have no knowledge of any other Francis E. Heydt Company employee contacting or assisting such companies with respect to the solicitation. In fact, my only contacts with representatives of [the other bidders] have been solely in connection with occasional subcontracting activities between the companies and the Francis E. Heydt Company.

I have no knowledge of any facts which relate to the Defense Logistics Agency's allegation that Mr. Heydt paid Mr. Donald Sherry two payments of $5,000 each in 1986. Since I am and have been responsible for the Francis E. Heydt Company's accounts payable, I have personal knowledge that no payments to Mr. Sherry or any other Government employee have ever been made from the company's acccunts.

On August 25, 1987, Mr. Heydt executed a trust agreement which resulted in his removal from the day-to-day management of the company. Mr. Heydt physically departed the company's premises immediately after executing the trust, and he has not set foot on the company's premises since that date.

The three other employee affidavits were to like effect.

On November 5, counsel for FHC received a letter from the DLA (dated October 5) responding to FHC's September 28 submission of the trust agreement. In this letter, the DLA informed the company that the agency's Special Assistant for Contracting Integrity had reviewed the trust agreement, but that "without knowing more about the circumstances underlying and surrounding the apparent activity which has formed the basis for the proposed debarment, he was unable to evaluate the significance of Mr. Heydt's action in placing the titular ownership of FHC into trust." The DLA also noted that "[w]ithin thirty days after its receipt of the Notice of Proposed Debarment, FHC will have the opportunity to submit information or argument in opposition," and that "should Mr. Heydt and [counsel for FHC] care to meet with [the Special Assistant] to discuss the circumstances giving rise to the allegations," it would arrange an appointment.

On November 6, counsel for FHC responded to the DLA's October 5 letter by stating that (1) the trust agreement did more than place "titular" ownership of FHC in trust; and (2) they did not represent Heydt and therefore were not in a position to arrange a meeting between

Heydt and the DLA. The November 6 letter did not suggest any arrangements in addition to the trust that might satisfy the DLA's stated concern that the trust agreement was insufficient to establish FHC's present responsibility.

On November 10, after requesting and receiving the DLA's file on the matter, FHC submitted (1) an additional letter correcting factual errors in the summaries, contained therein, of Dun & Bradstreet reports detailing the corporate relationships among the companies allegedly controlled by Heydt; and (2) an affidavit of the FHC employee who prepared the disputed bid explaining the circumstances under which the bid was prepared and pointing out several factual errors in Sherry's account, which was also in the file. Like the November 6 letter, FHC's November 10 letter suggested no additional measures that might satisfy the concerns that the DLA had expressed in its October 5 letter.

On December 24, 1987, the DLA issued a notice of debarment along with a memorandum explaining its decision. First, the DLA found, based upon Sherry's testimony, that Heydt had in fact committed the improper acts alleged. Noting the absence of either any affidavit by Heydt denying the alleged bidrigging and bribery or any explicit denial or explanation of such conduct by FHC, the DLA explained that "the uncontroverted information which is currently available in the administrative record concerning the proposed debarment of FHC is adequate to believe that FHC and Mr. Heydt on FHC's behalf have engaged in seriously improper conduct."

The DLA then rejected FHC's argument that the existence of the trust arrangement made it presently responsible. The debarring official first reiterated the rationale set forth in the DLA's October 5 letter, *supra,* and then added a further reason:

> ... [T]he trust arrangement provides only the most minimal screen between Mr. Heydt and FHC. Counsel contends that Mr. Heydt cannot control the trust. This may be true, but under the terms of the trust Mr. Heydt has only given up control of the assets of FHC, [and] he

will continue to enjoy all of the benefits of ownership of FHC. He will receive, quarter-annually the entire income of FHC and he retains the reversionary interest in the body of the trust. Mr. Heydt's reversionary interest in FHC may reasonably be expected to have a chilling effect on the current management of the company, inasmuch as Mr. Heydt will regain direct control of FHC upon termination of the trust. Mr. Heydt then will be able to reward or punish FHC managers and employees in accordance with how well they have followed his business practices and policies in managing FHC on his behalf.

The DLA concluded that (1) Heydt had "participated in a scheme to make improper payments to a Government official and to circumvent free and open competition for the award of a public contract"; (2) Heydt's conduct would be imputed to FHC because it occurred "in connection with his performance of his duties for or on behalf of FHC, or with [the company's] knowledge, approval, or acquiescence"; (3) FHC is an affiliate of Heydt because through his beneficial and equitable interests he "controls or could control" the company; and (4) all of the foregoing affect "FHC's present responsibility to be a Government contractor ... and reflect[ ] negatively upon the propriety of further Government business dealings with FHC," making debarment of FHC "necessary to protect the Government's interest in doing business only with contractors who conduct business with honesty and integrity."

Robinson then brought this action in the district court raising a variety of claims, as to each of which the district court granted the Government's motion for summary judgment and each of which he renews here.

## III. DISCUSSION

Robinson challenges the merits of the DLA's decision on two grounds. He argues, first, that the Government failed to meet its burden of showing that the alleged improper conduct ever occurred, and, second, that the trust arrangement, along with

the affidavits submitted by Robinson and the FHC employees, adequately establish FHC's present responsibility as a government contractor. In the alternative, Robinson argues that the information submitted by the company was at least sufficient to raise material issues of fact as to both of the foregoing points, such that the DLA should have held a hearing. Finally, Robinson argues that the DLA's regulation allowing debarment for lack of "present responsibility" is unconstitutionally vague, both on its face and as applied to FHC.

## A. Evidentiary Support for the Charge of Improper Conduct

■ Robinson argues that Sherry's unsworn statement cannot alone sustain the DLA's conclusion that Heydt more likely than not bribed a government official and orchestrated a bid. Second, he claims that, in light of the affidavits of FHC's employees stating that they had no knowledge of the alleged improper conduct, the DLA erred in crediting Sherry's statement. We address these arguments in turn.

1. *Sherry's Statement.* Robinson's attack on the sufficiency of Sherry's statement to support the DLA's decision rests on the proposition, developed in the context of criminal proceedings, that accomplice testimony and testimony given in exchange for either immunity or leniency should be treated with caution. *See, e.g., Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *United States v. Iverson,* 637 F.2d 799, 803 (D.C.Cir.1980). A witness seeking immunity or leniency may have an interest in cooperating with the Government, even if it means giving a false account, *United States v. Leonard,* 494 F.2d 955, 961 (D.C. Cir.1974); *United States v. Lee,* 506 F.2d 111, 119 (D.C.Cir.1974), and an accomplice may wish to shift blame away from himself by implicating another, *Bruton v. United States,* 391 U.S. 123, 136, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968); *Leonard,* 494 F.2d at 961. Thus, courts have required the Government to disclose any plea or immunity arrangement it has with a witness, and will generally grant a defendant's request for a cautionary instruction to the jury.

For several reasons, however, we do not find the principle upon which Robinson relies dispositive of this case. As an initial matter, it is worthy of note that even uncorroborated accomplice testimony, standing alone, may support a criminal conviction. *See Lee,* 506 F.2d at 118; *id.* at n. 18 (citing cases). Thus the mere possibility that such testimony may be false does not create, as a matter of law, a reasonable doubt as to its truth.

More importantly, the present proceeding differs significantly from a criminal case. The Government need prove its case by only a preponderance of the evidence. Where, as here, the factfinder's task is to decide only whether "the fact at issue is more probably true than not," 48 C.F.R. § 9.403, the factfinder is certainly not bound, merely because a witness's statement may serve his interest, to find that the truth is likely to be the opposite of what the witness states.

Moreover, nothing in the context in which Sherry gave his statement undermines the DLA's determination not to disregard it entirely. Although, according to the Government's plea memorandum to the court in the case against Sherry, the Government specifically reserved "the right to take whatever position it deems appropriate with regard to sentencing …," Sherry agreed only generally "to cooperate fully with the government in its investigation of the [DPSC] and contractors doing business with it." He did not agree specifically to implicate Heydt or anyone else in exchange for leniency in sentencing. We see no indication in the record that, at the time Sherry gave his statement, the Government suspected (or suggested to Sherry) that Heydt might have been a part of the apparent bidrigging and bribery conspiracy that it was then investigating. The Government's recitation of the factual basis underlying Sherry's plea did not refer to Heydt, although it did detail the evidence it had obtained, with Sherry's help, against others. FHC has advanced no theory under which Sherry would have had

any independent motive to implicate Heydt, and we can think of none, apart from a general desire to give the Government as many names as possible. We therefore cannot fault the DLA's conclusion that Sherry's statement, standing alone, constituted sufficient proof that the events in question more likely than not occurred.

2. *The Company's Response.* In support of his argument that the company's submission precluded the debarring official from crediting Sherry's statement, Robinson first points to the statements by FHC employees denying any personal knowledge of either bidrigging or improper payments by Heydt, including the assertion of the company's inside accountant that "If company money was used to pay Mr. Donald Sherry, my accounting records would reflect such a payment," and that his records show no such payment. Second, Robinson argues that the DLA should not have held against the company Heydt's failure specifically to deny the charges made by Sherry, since the company was not in a position to obtain a statement from Heydt responding to the allegations against him. In support of this last point, Robinson represents, and the Government does not dispute, that Heydt is the subject of a criminal investigation and is represented by separate counsel, who has apparently advised his client not to cooperate in this proceeding.

As to Robinson's first point, the statements of FHC's management employees are not inconsistent with Heydt's having made improper payments to Sherry. It would hardly be surprising for Heydt to have acted alone in his transactions with Sherry while the mechanics of the underlying bid proceeded through legitimate channels within the corporation. Recording his scheme in the company's books would only have risked its being revealed; indeed, given that he held all the equity of the company, it would have made no financial difference to him whether the payment came from company funds or from his own pocket. Therefore, in light of all the evidence before him, including the company's affidavits, the debarring official could reasonably conclude that Heydt had, more likely than not, made illegal payments off the company's books.

As to Robinson's second point, we agree that the company is in a somewhat difficult position because the Government is holding it accountable for failing to explain or deny acts allegedly committed by its agent, who will not make available any exculpatory information he may have. The company's dilemma stems entirely from the Government's regulation—the validity of which Robinson does not challenge—permitting the agency to impute to a contractor the improper conduct of its officer, director, shareholder, or employee, as long as that conduct "occurred in connection with the individual's performance of duties for or on behalf of the contractor." 48 C.F.R. § 9.406–5. This rule simply recognizes that a corporation cannot act except through the human beings who may act for it. Thus, it contemplates that a corporate contractor may be held responsible for the wrongful act of its agent, even though "the corporation" was not "aware" (as a practical matter, through its other agents) of the wrong and thus cannot specifically deny that it took place. The regulation puts FHC in a difficult but by no means an unusual position, since a rule of vicarious responsibility will inevitably result in situations in which a company charged with the acts of its agent is compromised in defending itself because it cannot compel the agent to speak in the company's defense. The Government cannot be required to suspend its rule of imputed misconduct, however, in every case in which a contractor lacks access to a witness whose testimony might exonerate it.

First, the Government must be able to fulfill its statutory duty of dealing only with responsible contractors. Once a credible charge of improper conduct comes to the DLA's attention and the regulatory scheme for resolving such charges is set in motion, the responsible officer must make a decision based upon the available evidence. If the record contains evidence that, standing alone, indicates to the officer that improper conduct more likely than not occurred, and no evidence to the contrary is available, we cannot deem it arbitrary for

the officer to conclude that the alleged conduct did occur. The decisionmaker must protect the Government's interests—both in rooting out irresponsible contractors and in not disqualifying responsible contractors that compete for its business—and its interests would not be served by a rule requiring him to ignore evidence of wrongdoing simply because the alleged wrongdoer is unable or unwilling to come forward to deny the charges.

Second, adhering to a rule of imputed misconduct in a case where the wrongdoing agent is unavailable to testify does not leave the contractor without recourse, since even if it is unable to demonstrate that the improper act did not occur, it may still show that it is nonetheless presently responsible. It is to that aspect of Robinson's challenge that we now turn.

### B. *FHC's Present Responsibility*

Under the applicable regulations, the ultimate inquiry as to "present responsibility" relates directly to the contractor itself, not to the agent or former agent personally responsible for its past misdeeds. Thus, the contractor can meet the test of present responsibility by demonstrating that it has taken steps to ensure that the wrongful acts will not recur. *In re Jerry A. Costacos*, GSBCA No. 7547–D (Gen.Serv.Admin. Susp. & Debarment Bd., slip op. April 9, 1985), for example, the Board held that a contractor that continued to employ a debarred individual had, by adopting controls to prevent the employee from becoming involved with or exercising any influence over contracts with the Government, sufficiently negated the possibility that the company would be a future business risk to the Government, and that it could not be debarred for want of present responsibility to be a government contractor. Affording the contractor this opportunity to overcome a blemished past assures that the agency will impose debarment only in order to protect the Government's proprietary interest and not for the purpose of punishment.

In this case, Robinson argues that the DLA should have credited the trust arrangement as sufficient, notwithstanding Heydt's past conduct, to establish the company's present responsibility to do business with the Government. Robinson points both to the trust agreement, which gives him full management authority over the company, and to the affidavits of the management employees of FHC stating that Heydt has removed himself from FHC's premises and, to their knowledge, has had no business contact with the company since the effective date of the trust agreement. (Counsel for Robinson represents that the affiants comprise all of FHC's management staff, an extra-record point on which we indulge FHC for present purposes.)

The DLA, as noted previously, took the position that without some explanation of the circumstances surrounding the alleged improper conduct by Heydt, it was unable to evaluate the efficacy of the trust in ensuring that such conduct was not likely to recur. That determination was neither arbitrary, nor capricious, nor an abuse of discretion.

Fully crediting the company's assurances that the trust agreement left the ultimate decisionmaking authority to someone other than Heydt and that, as of the time the affidavits were sworn, Heydt had little or no contact with the company, the DLA would still have at least two legitimate concerns. First, although the trust agreement gives Robinson direct authority over all company operations, it contains no specific term barring Heydt from either acting on behalf of the company or participating in its management. Therefore this case is unlike *Costacos*, where the contractor had instituted specific corporate controls to "wall off" the debarred employee from participation in government contracts and the evidence indicated that those controls would indeed be enforced. FHC offered no assurances that Heydt would be excluded from the company's business decisions.

Second, and more important, nothing in either the trust agreement or in any other submission by the company gave the Government any assurance that Heydt would not conduct illicit dealings on behalf of FHC entirely outside company channels.

FHC's employees, in their affidavits, stated only that they knew nothing of Heydt's improper contacts with Sherry; that the company's books did not reflect any payments to Sherry; and that prior to establishing the trust arrangement, Heydt spent little time at FHC's offices and left day-to-day management responsibilities largely up to them. The inference to be drawn, therefore, is that Heydt's contacts with Sherry took place entirely outside company channels. The DLA could not tell from the information submitted by FHC how the transactions with Sherry took place; it knew nothing of the source from which the money was drawn, the medium through which the illicit arrangements were made, or the means Heydt used to conceal his activities from his employees. The Government knew only that Heydt had managed to circumvent whatever company controls might have been in existence prior to the effective date of the trust; and that, by virtue of both his continued right to receive the company's income and his reversionary interest in the trust, he still had a direct and substantial interest in any contracts awarded to the company. Without further details as to how he effected his secret deal, it had no way of knowing whether entrusting the company to Robinson was likely to prevent a repeat performance by Heydt. Viewing the facts that were before the debarring official, we cannot characterize as arbitrary, capricious, or an abuse of discretion his conclusion that "[w]ithout knowing either the scope or the extent of the conduct, I am unable to determine whether Mr. Heydt's having placed the assets of FHC into a temporary trust and having appointed a temporary trustee to operate for the company would sufficiently protect the Government's interests in doing business only with contractors who conduct business with honesty and integrity."

Because we hold that the DLA reasonably found the trust agreement inadequate to assure that Heydt would not continue to act improperly in FHC's interest as a government contractor, we need not address the reasonableness of the agency's alternative rationale—*viz.*, that Heydt's continuing interest would have a "chilling effect" on the company's present employees, by which we presume the DLA to mean that the employees might either secure contracts by illicit means, or tolerate Heydt's doing so, in order to curry his favor or avoid his retribution upon his return to the company—nor whether the agency properly found that FHC was an "affiliate" of Heydt.

C. *Was the DLA Required to Hold a Hearing?*

■■■ Robinson next argues that, even if the evidence before the DLA established a prima facie case of "cause of so serious or compelling a nature that it affects [FHC's] present responsibility," 48 C.F.R. § 9.406–2(c), the company's responsive submissions raised "a genuine dispute over facts material to the proposed debarment," *see* 48 C.F.R. § 9.406–3(b)(2)(i), which entitled it to a hearing.

As an initial matter, we note that FHC apparently never requested that the DLA hold a hearing on the issue of its present responsibility; rather, in its submissions to the DLA, it took the position that the trust arrangement, along with the affidavits of its employees, were sufficient to preclude debarment. At oral argument, FHC's counsel took the position that the procurement regulations do not specifically require a contractor to request a hearing, but rather call upon the agency to conduct a hearing if there is a material issue of fact in dispute. Indeed, in its initial notice of proposed debarment, the DLA stated that if FHC's submissions raised a genuine dispute over any material fact, "factfinding *will be conducted* to determine the disputed facts." (Emphasis added.) This ambiguous message could reasonably be understood to promise that a hearing will be held if it is warranted, without the necessity for counsel to make a further request. Because we hold, however (as discussed more fully below), that the DLA was not required to grant even a properly requested hearing in this case, we need not address the questions whether the company was required to make such a request, or whether, assuming it was, the company, by

submitting evidence in response to the notice of proposed debarment, adequately voiced its desire for a hearing before any adverse decision.

With respect to a hearing on the issue whether the alleged conduct occurred at all, as we have seen, FHC proffered no evidence directly refuting Sherry's statement that Heydt committed the acts alleged; the affidavits of its employees indicated only that they were not aware of any improper conduct. We have already held that the debarring official could reasonably have concluded, taking the company's written evidence as true, that the alleged conduct occurred outside company channels. FHC has not shown how a hearing on this issue would have added anything material to the record before the debarring official.

Robinson argues that a hearing was required nonetheless because the company, in its submissions, pointed out several factual inaccuracies and inconsistencies in Sherry's statement. The company's evidence indicated, for example, that (1) the allegedly corrupted contract called for night-time camouflage pants at $50.00 per pair, rather than, as reported by Sherry, day-time pants at $52.00 per pair; and (2) Heydt could not have orchestrated bids in November 1985, as reported by Sherry, since prospective contractors were not informed of the availability of the contract until December 30, 1985.

These and the other factual inaccuracies Robinson identifies were insufficient to raise a *material* issue of fact, one going to the truth of that portion of Sherry's statement that mattered—*i.e.*, his report that Heydt orchestrated bids and paid Sherry $10,000 for his help in obtaining the contract. The inaccuracies noted in the company's affidavits would at best raise a question as to Sherry's memory for minor details. Indeed, the DLA could reasonably have seen Sherry's having recalled that the contract was for camouflage pants, and putting FHC's bid at a price quite close to what the company reports it was, as tending to bolster his credibility. In any event, the minor inaccuracies in Sherry's statement certainly did nothing to impeach either his memory of, or his veracity with respect to, the corrupt transaction by which the contract came to be awarded to FHC.

Nor was a hearing required on the question of Sherry's veracity merely because of the possibility that he was motivated by a desire for a lenient sentence. In an analogous context, courts will credit, for purposes of summary judgment under Rule 56, affidavits of corporate officials denying allegations of misconduct that, if true, would describe a criminal violation, *see, e.g., Scranton Construction Co. v. Litton Industries Leasing Corp.*, 494 F.2d 778, 782 (5th Cir.1974) (alleged price fixing and other conspiracies); *McCaskill v. Texaco, Inc.*, 351 F.Supp. 1332, 1340 (S.D.Ala.1972), *aff'd*, 486 F.2d 1400 (5th Cir.1973) (alleged price fixing conspiracy), although one might equally well speculate that such denial is motivated by a desire to avoid self-incrimination. More generally, it is well settled that a party may not defeat a properly supported motion for summary judgment merely by raising generalized questions as to the credibility of the movant's affiants. *See, e.g., Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1084 (3d Cir.1988) (a "generalized allegation of [an affiant's] self-interest does not suffice to raise a genuine question of material fact … [;] 'neither a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment.'") (quoting *National Union Fire Insurance Co. v. Argonaut Insurance Co.*, 701 F.2d 95, 97 (9th Cir.1983)). *Cf. Strickland v. Watt*, 453 F.2d 393, 394 (9th Cir.1972) (affiant's previous felony conviction did not undermine credibility so as to preclude summary judgment where non-moving party had introduced no evidence to contradict the essential facts stated by affiant). Finally, we note that the statutory penalty for making a false statement to a government agency, *see* 18 U.S.C. § 1001, provided Sherry with a strong disincentive to lie to the investigators when he implicated FHC in bribery and bidrigging. We therefore cannot conclude that the DLA acted unlawfully in finding that FHC had failed to raise a

genuine issue as to the veracity of Sherry's statement.

Robinson also suggests that FHC was entitled to a hearing on the question whether, assuming Heydt committed the misconduct alleged, the trust arrangement nonetheless rendered the company presently responsible. We have already upheld as reasonable, however, the DLA's conclusion that it could not determine whether placement of the company in Robinson's hands would ensure that Heydt would not again circumvent corporate channels in order illicitly to obtain contracts for FHC. The efficacy of the trust arrangement was in doubt, therefore, because Heydt, by virtue of his beneficial interest, had the same incentive to act illicitly on the company's behalf, and nothing in the trust arrangement clearly diminished his ability to do so. In these circumstances, a hearing on the trust itself would have added nothing of relevance to the issue of FHC's present responsibility.

D. *The Constitutionality of the "Presently Responsible" Standard*

 Robinson challenges the DLA's decision on the ground that the standard of conduct to which FHC was held under the FAR is so vague as to deny it the notice required by the Due Process Clause of the Fifth Amendment. His premise is our prior holding that a corporation may have a "right to be free from stigmatizing governmental defamation" such that a false government statement that has an adverse effect on the company's ability to do business implicates the Due Process Clause. *Old Dominion Dairy Products, Inc. v. Secretary of Defense*, 631 F.2d 953, 961 (D.C.Cir.1980). Assuming that FHC had a protected interest under this standard, which the Government does not specifically dispute, we hold that the regulation under which FHC was debarred is not unconstitutionally vague as applied to this case.

To reiterate, the regulation specifically permits an agency to debar a contractor if it has been convicted of, or is subject to a civil judgment for, *inter alia,* fraud in connection with obtaining a government contract, a violation of the antitrust laws, or bribery, or for "[a]ny other cause of so serious or compelling a nature that it affects the present responsibility of a Government contractor...." 48 C.F.R. § 9.406–2. The "[a]ny other cause" provision must be read in the context of the other provisions listing specific "cause[s]." Since fraud, bribery, and antitrust violations are specifically listed as acts for which conviction or a civil judgment may result in immediate debarment, it could hardly come as a surprise to FHC that paying a government contract official as part of a bidrigging scheme would come within the scope of the "[a]ny other cause" provision. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974).

Nor are we persuaded by Robinson's cognate argument that the regulation is impermissibly vague because it is "utterly without guidance" as to what steps a contractor must take in order to give assurance that it is presently responsible after a prior fall from grace. On the facts of this case, the company is simply in no position to claim a want of notice, and certainly none so stark as to deny it due process.

FHC, in its original October 20, 1987 submission, presented the trust agreement as its chosen instrument for allaying any concern the Government might have as to its present responsibility, and in that context represented that the company was "willing to take any steps deemed necessary" by the DLA to protect the Government's interests. When FHC received notice on November 5 that the DLA had doubts as to whether a trust arrangement sufficiently protected the Government's interests, however, it neither proposed other steps that the company might take in order to provide assurance of its present responsibility nor requested that the Government suggest any specific steps to it. Rather, in both its November 6 and November 10 letters, it simply stood on its ground that the trust was adequate. It cannot be heard now to complain that it did not know what more was required of it, after maintaining

**164**

before the agency that it need not do anything more in order to show that it was "presently responsible."

Insofar as Robinson's argument is that the regulation is unconstitutional on its face because it does not specify what a contractor must do in order to establish present responsibility, we need not address it because the company "may not press a facial due process attack concerning the [regulation] after the [regulation] has been applied fairly to [it]." *Hastings v. Judicial Conference of the United States*, 829 F.2d 91, 105 (D.C.Cir.1987).

### IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is

*Affirmed.*