**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Karen L. SCHERM and Robert Zimmerman, Defendants.**

**Civ. A. No. 1:92–CV–1145–JOF.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 28, 1993.

Edward Gary Sullivan, Carolyn R. Bregman, Pat Huddleston, S.E.C., Atlanta, GA, for plaintiff.

John Ludlow Latham, Scott Kenan Tippett, Nelson, Mullins, Riley & Scarborough, Atlanta, GA, for defendants.

Robert Zimmerman, pro se.

## ORDER

FORRESTER, District Judge.

This matter is before the court on Plaintiff Securities and Exchange Commission's motion for summary judgment. The Commission ("SEC") has alleged that Robert Zimmerman aided and abetted Karen L. Scherm in the commission of numerous securities fraud violations under section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5. Codefendant Karen L. Scherm agreed to a consent judgment earlier in this matter permanently enjoining her from further activities relating to the securities industry. In addition, Scherm entered into a plea agreement pursuant to which she pled guilty to one count each of mail and wire fraud. She was sentenced, served her sentence and is currently under supervised release. Against Zimmerman, the SEC seeks a permanent injunction and an accounting and disgorgement of alleged ill-gotten gains. Zimmerman is also being investigated by the United States Attorney. In response to the statement of material facts and evidence submitted by the SEC, Zimmerman has chosen to assert his Fifth Amendment privilege against self-incrimination.

## I. UNDISPUTED FACTS

Robert Zimmerman is a certified public accountant and resides in Alpharetta, Georgia. Between January 1986 and April 1988, he was president and majority shareholder of Zimmerman Financial Services, Inc., a Georgia corporation located in Atlanta, Georgia. Karen Scherm was a representative of Drexel Burnham Lambert ("Drexel"), a registered securities broker and dealer, from January 1986 until she was discharged in May 1988. Zimmerman and Scherm first became acquainted when he was a client of hers in 1983 while she was employed at Dean Witter Reynolds, Inc. When Scherm moved to Drexel, Zimmerman and his company, Zimmerman Financial Services, followed her as a customer.

During the early portion of Scherm's tenure at Drexel, Zimmerman's relationship with Scherm changed from that of merely a client to a friend. Scherm was undergoing marital as well as financial difficulties, and Zimmerman first suggested that she use money from her customers' accounts to make up for shortfalls of her own and repay it later. She followed up on this suggestion on a number of occasions. In late 1987, Zimmerman began to suffer sizeable losses from the trading of options. To cover these losses, he directed Scherm to remove money and make unauthorized trades in other customers' accounts in order to cover his trading losses and outside debts. In addition, Zimmerman routinely directed Scherm to pass on checks and wire transfers from her Drexel customers' accounts. He then deposited these monies into bank accounts which he controlled. Zimmerman's distinctive signature appears on the reverse side of these checks endorsing them for deposit into his

accounts. Often, he would retain a portion of this money and wire or mail the remainder into another of Scherm's customers' accounts that needed to be paid off immediately. Scherm testifies that Zimmerman was able to direct and control her in engaging in this conduct initially through his charm and persuasion. She states that he later made threats against her directly and later threatened to reveal her wrongdoing and have her daughter taken away from her. Furthermore, the deeper Scherm got into this scheme, the more she realized that his assistance was critical to her avoiding detection.

### A. Activities in Karen Sooy's Account

In November 1986, Scherm made a number of unauthorized trades in Karen Sooy's account at Drexel. Zimmerman knew that Karen Sooy was a client of Scherm's and directed that Scherm take money from Karen Sooy's account to make up for his own trading losses. Scherm gave Zimmerman a check dated November 25, 1986, for $50,000 drawn on Karen Sooy's Drexel account. Zimmerman knew that this check was drawn on Sooy's account without her authorization when it was given to him. He took this check, endorsed it and deposited it into a bank account he controlled. After depositing these funds, he transferred them to his Drexel account to cover his own trading losses.

In April 1987, Scherm gave Zimmerman another check from Karen Sooy's account dated April 10, 1987, for $50,000. Zimmerman knew this check was taken without Karen Sooy's authorization, and he took the check, endorsed it and cashed or deposited it into a bank account he controlled.

Zimmerman was also able to obtain a check dated February 9, 1987, in the amount of $41,000 and made payable to Karen Sooy. He acquired the check either by removing it personally or by making arrangements for another to remove it from Karen Sooy's mailbox. Zimmerman told Scherm of his intent to obtain this check and confirmed with her that he had gotten the check after its removal. Zimmerman, however, lost the check at a restaurant and telephoned Scherm to tell her that he was unsure when it was lost and whether he had endorsed the check or not.

The check was subsequently found by a restaurant busboy, who called Karen Sooy's house and spoke to her roommate, who then called Scherm. Scherm retrieved the check and redeposited it into Karen Sooy's Drexel account.

### B. Activities in Tom and Joan Scherm's Account

In March 1987, Scherm was making unauthorized trades in the account of her then in-laws, Tom and Joan Scherm. Zimmerman knew that Tom and Joan Scherm were customers of Karen Scherm, and accepted a check drawn on their account for $13,500. He knew that the withdrawal was unauthorized, but he nevertheless endorsed it and deposited it into a bank account of his company, Zimmerman Financial Services.

On another occasion, Scherm was questioned by Tom Scherm about numerous unauthorized trades in his account and a shortfall of $100,000. She assured him that the reason for this supposed shortfall was that she had taken the $100,000 and deposited it into a certificate of deposit at Drexel. When Tom Scherm did not believe her, she telephoned Zimmerman, while representing to Tom Scherm that she was calling Drexel's C.D. Department in New York. After explaining to Zimmerman the reason for her call, Zimmerman represented to Tom Scherm that he was from Drexel's C.D. Department and assured him that his money was safely invested. Tom and Joan Scherm's money was not so invested.

### C. Activities in Betty Gibian's Account

Sometime in the mid–1980's, Scherm convinced Betty Gibian to transfer her portfolio of municipal bonds and equity securities to Drexel. She convinced Betty Gibian to invest with her based on the fact that she stated that she would retain an independent money manager to manage Gibian's portfolio. Scherm did not retain a money manager as promised and engaged in a series of unauthorized sales in her account beginning in September 1987. At some point Scherm or Zimmerman forged a letter of authorization for withdrawal of $60,000 from Gibian's Drexel account. Once this check was drawn,

Scherm gave Zimmerman the check in that amount dated December 22, 1987. Zimmerman knew that this check was drawn on Betty Gibian's account without her authorization, but he nonetheless endorsed it and deposited it into the Zimmerman Financial Services' bank account which he controlled.

### D. *Activities in the Rotenstreich Family Partnership Account*

In 1988, Joel Rotenstreich was a partner in the Rotenstreich Family Partnership which maintained two brokerage accounts with Drexel in Atlanta. Rotenstreich had the sole authority for these accounts. Scherm convinced Rotenstreich to transfer $100,000 to her for the purchase of various bonds. Scherm did not make the purchases promised and made unauthorized purchases and sales in the Rotenstreich account.

In February 1988, Scherm had two checks drawn on the Rotenstreich Drexel account for $48,665.00 dated February 5, 1988 and for $113,601.00 dated February 9, 1988. Scherm gave both checks to Zimmerman. Zimmerman knew these checks were drawn on the Rotenstreich account without authorization. He endorsed both checks and deposited them into the Zimmerman Financial Services account, which he controlled. Some portion of this money wound up in Zimmerman's account at Drexel. To cover themselves, Scherm delivered false account statements prepared by Scherm and Zimmerman and represented that these statements accurately reflected the activity in the Rotenstreich account.

### E. *Amy Sooy's Money*

In May 1988, on the day before Scherm was suspended as a representative at Drexel, she picked up a check that had been mailed to her at Drexel from Amy Sooy for $246,-475.90. Amy Sooy, the stepdaughter of Karen Sooy, sent the money for Scherm to invest. Instead, Scherm was suspended and did not return to work and invest this money.

Part of the initial reason for Scherm's suspension came from inquiries by one John Bacaris, an alleged drug dealer and money launderer, as to money supposedly forwarded to Scherm by Zimmerman for investment.

Zimmerman had been acquainted with Bacaris and allegedly laundered money for him. Zimmerman had taken the money given to him by Bacaris for himself. He had written without authorization, however, to Bacaris on Drexel stationery that this money was safely invested at Drexel. Because Zimmerman owed Bacaris this money, the decision was made by Scherm and Zimmerman that Zimmerman would deposit the check into his own bank account and use the money to pay Bacaris the money he owed him. Zimmerman thereafter transmitted the funds to his then-attorney, Steve Sadow, who then wired the money to John Bacaris.

## II. LEGAL DISCUSSION

The SEC contends that the uncontroverted facts overwhelmingly show that Zimmerman aided and abetted Scherm in numerous misrepresentations and omissions of material facts to her customers, diverted and misappropriated customers' funds, and engaged in unauthorized trades and transactions in customers' accounts. Zimmerman acknowledges that he has asserted his Fifth Amendment privilege in response to virtually all of the statements of material facts submitted by the SEC. He argues, however, that no adverse inference may be drawn by the court as to this assertion of his Fifth Amendment privilege, and that the SEC relies so heavily on the testimony and affidavits of Karen Scherm that the concern as to her credibility as a convicted felon prevents the court from granting summary judgment as a matter of law.

### A. *Adverse Inference*

 The general rule is that an adverse inference may be drawn against a party in a civil action when he refuses to testify in response to probative evidence offered against him. *Baxter v. Palmigiano*, 425 U.S. 308, 317–18, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976); *United States v. A Single Family Residence and Real Property*, 803 F.2d 625, 629 n. 4 (11th Cir.1986). This adverse inference, however, is insufficient by itself to allow summary judgment to be entered against a party. Rather, a party seeking summary judgment must establish inde-

pendently the elements of the claim within the confines of *Federal Rule of Civil Procedure* 56. *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir.1991) (negative inference does not substitute for evidence needed to meet the burden of production); *Hoover v. Knight*, 678 F.2d 578, 582 (5th Cir. Unit B 1982)[1] (direct evidence in addition to negative inference confirmed appellee's involvement); *SEC v. Rehtorik*, 135 F.R.D. 204, 205 n. 2 (S.D.Fla.1991) (referencing previous order holding that silence alone will not give rise to automatic liability). It is the production of additional evidence above and beyond any negative inference to which Judge Johnson referred when he stated that the adverse inference may not be used to cause the "automatic entry of summary judgment." *United States v. Premises Located at Route 13*, 946 F.2d 749, 756 (11th Cir.1991) (citing *Pervis v. State Farm Fire and Casualty Co.*, 901 F.2d 944, 947 (11th Cir.1990)); *see also National Acceptance Co. of America v. Bathalter*, 705 F.2d 924, 932 (7th Cir.1983).[2]

In moving for summary judgment, the SEC has offered the testimony of Karen Scherm by way of a separate sworn statement which was not subject to cross-examination, and a sworn affidavit. The SEC has also submitted copies of checks which Zimmerman allegedly endorsed and deposited into his bank accounts, Zimmerman's bank account records, letters allegedly forged by Zimmerman to Drexel allowing for the withdrawal of funds from Scherm's customers' accounts, and the affidavits of Tom Scherm, Joan Scherm, Betty Gibian, and Joel Rotenstreich. The SEC, therefore, has not relied on the mere adverse inference to be drawn from Zimmerman's silence in moving

for summary judgment. Summary judgment may not be precluded, therefore, on this ground.

### B. *Credibility*

■ Zimmerman is correct in arguing that some courts have refused to grant summary judgment based on questions of credibility of a witness who was a convicted felony. *See, e.g., United States v. Wade*, 577 F.Supp. 1326, 1331–32 (E.D.Penn.1983). Such courts have only done so, however, when the party opposing the motion has produced no additional evidence supporting its contention that the particular witness's testimony is not credible. State of mind issues, in other words, must be treated by a court just as any other factual issue when considering summary judgment. *Robinson v. Cheney*, 876 F.2d 152, 162 (D.C.Cir.1989); *Corrugated Paper Products v. Longview Fibre Co.*, 868 F.2d 908, 914–15 n. 6 & 7 (7th Cir.1989); *Strickland v. Watt*, 453 F.2d 393, 394 (9th Cir.1972) (fact that affiant was a convicted felon insufficient to preclude summary judgment where appellants had not contradicted any facts asserted in the affidavit); *Radio City Music Hall Corp. v. United States*, 135 F.2d 715, 718 (2d Cir.1943) (Hand, J.).

Zimmerman has produced no evidence in responding to the SEC's motion. Furthermore, he has not pointed in his brief to any particular inconsistencies in Scherm's testimony. The mere assertion that she pled guilty to securities fraud in federal court and was convicted of fraud and conversion in a state court and has a "reputation for untruthfulness," absent additional evidence offered to contradict the facts she has asserted, also

---

1. Decisions of the former Fifth Circuit rendered prior to October 1, 1981, unless overruled by the Eleventh Circuit *en banc*, are binding precedent in this court. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981). The Eleventh Circuit has not ruled whether decisions rendered after October 1, 1981, are binding or not.

2. As the Seventh Circuit in *Bathalter* eloquently explained:

Inevitably, in civil cases where related criminal charges are involved, tension will arise between plaintiff's rights to a just and timely adjudication and defendant's rights to refuse to answer under the Fifth Amendment upon a reasonable fear of prosecution. At the least,

defendants may not be free to defend the case as they would like, *cf. U.S. v. White*, 589 F.2d 1283, 1286 (5th Cir.1979), while plaintiffs may be prevented from acquiring evidence helpful, or even necessary, to their case. That tension is not for us to resolve for it has its sources in the Constitution itself.... Nevertheless, for the problem before us, *Baxter* draws a bright line. Because a plaintiff may not rest a judgment on a defendant's constitutionally protected silence alone, a valid claim of privilege in response to the allegations of a complaint must not be treated as an admission of those allegations. 705 F.2d at 932.

is insufficient. A question as to Scherm's credibility will not bar summary judgment in this case.

### C. *Aiding and Abetting*

 The gist of the SEC's contentions is that Zimmerman aided Scherm in the commission of securities fraud. "Before someone can be caught within the net of aiding and abetting liability under Rule 10b–5, another party must have violated the securities laws, the alleged aider-abetter must be generally aware of his role in the improper activity, and he must knowingly render substantial assistance." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir.1975); *see also Schneberger v. Wheeler*, 859 F.2d 1477, 1480 (11th Cir.1988) (citing *Woodward*). The second and third prongs of this test have been analyzed by this circuit and its predecessor to assure that liability will not arise for assistance to fraudulent conduct arising only as a result of routine daily business operations. *Woodward*, 522 F.2d at 95–96; *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009–10 (11th Cir.1985). Thus, in evaluating the "general awareness" prong of the test, "surrounding circumstances and expectations of the parties" should be evaluated. *Woods*, 765 F.2d at 1009. This evidence is important, particularly where the transaction seems to be one conducted in the ordinary course of business. *Id.* Knowledge can be shown by circumstantial evidence, but "the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Id.* (citing and quoting *Woodward*, 522 F.2d at 96). As to

the knowing and substantial assistance prong, this circuit has emphasized that if the transaction is one in which the alleged aider-abetter would normally engage, then the threshold of proof of intent to violate the securities laws is high. On the other hand, "if the method or transaction is atypical or lacks business justification, it may be possible to infer knowledge necessary for aiding and abetting liability." *Woodward*, 522 F.2d at 97; *Woods*, 765 F.2d at 1010. Regardless, the proof of intent must show that the alleged aider-abetter's actions or inactions constituted at least "severe recklessness." *Woods*, 765 F.2d at 1010; *White v. Sanders*, 689 F.2d 1366, 1367 n. 4 (11th Cir.1982).

Zimmerman does not dispute that Scherm violated the securities laws and pled guilty to such violations. Furthermore, the evidence submitted by the SEC in that regard is overwhelming. Scherm repeatedly lied to and neglected to inform her customers, both verbally and in writing, of the unauthorized activities in which she and Zimmerman were engaging in their accounts. She has admitted that she knew this conduct was illegal and that she engaged in this conduct intentionally. Furthermore, it is clear that these customers relied on her statements and false reports, and that this activity caused the loss of their money. The requisite elements of underlying securities violations, therefore, are established beyond peradventure. *See Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989); *Leonard v. Stuart–James Co., Inc.*, 742 F.Supp. 653, 659 (N.D.Ga.1990) (Forrester, J.).[3]

---

3. This court acknowledges that the elements required in the underlying causes of action under section 17(a) of the 1933 Act and section 10(b) of the 1934 Act differ slightly. Section 17(a) which applies only to. sellers, provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 10(b), which applies to both buyers and sellers, makes it:

unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Pursuant to its rule-making power under this section, the Commission promulgated Rule 10b–5, which now provides:

As to the general awareness of Zimmerman, this case does not involve normal business transactions. For a representative of a broker-dealer to allow an outsider to control and direct the use of and transactions in any customer's account is clearly irregular. Zimmerman convinced Scherm to provide him checks from customers' accounts to which he knew he was not entitled. He used portions of this money to cover his own debts and to give back to Scherm to cover immediate needs in Scherm's other customers' accounts.

Furthermore, Zimmerman must have known what he was doing. As a certified public accountant, Zimmerman clearly would have understood the nature of these transactions and activities. Also, the fact that he directed much of these transactions and activities shows clearly that his "assistance" was done with the requisite *scienter* and knowledge.

Finally, Karen Scherm could not have engaged in this misbehavior without Zimmerman's substantial assistance. He provided false reports and account statements as well as helped her decide which accounts should be manipulated and when. He represented himself on at least one occasion as a Drexel employee and confirmed that money was safely invested when it was not. Zimmerman's assistance and benefits were so great that one could ask who in fact was assisting whom. A clear aider-abetter violation, therefore, is established.

### D. *Permanent Injunction*

 Once the SEC has proven a defendant's violation of the securities laws and

---

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1992). The elements required to prove securities fraud under either of

---

regulations, it must make a "proper showing" for injunctive relief under section 20(b) of the Securities Act and section 21(d) of the Securities Exchange Act. *Aaron v. Securities & Exchange Commission*, 446 U.S. 680, 689, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980); *Securities & Exchange Commission v. Continental Tobacco Co. of South Carolina*, 463 F.2d 137, 162 (5th Cir.1972). The SEC must demonstrate that there is a "reasonable likelihood, absent the issue of an injunction, that the wrong will be repeated." *Securities & Exchange Commission v. Blatt*, 583 F.2d 1325, 1334 (5th Cir.1978). And unlike private injunction actions which are rooted in equity jurisdiction, Commission suits for injunctions are creatures of statute, and, therefore, no proof of irreparable injury or inadequacy of other remedies needs to be shown. *Securities & Exchange Commission v. R.J. Allen and Associates, Inc.*, 386 F.Supp. 866, 881 (S.D.Fla.1974). The factors to be considered in assessing the need for a permanent injunction include:

> The egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of *scienter* involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Blatt*, 583 F.2d at 1334 (citing *Securities & Exchange Commission v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976)).

---

these sections or Rule 10b–5 are similar. One significant difference, however, is that the SEC is required to establish *scienter* as an element of a civil enforcement action to enjoin violations of section 10(b) of the 1934 Act, Rule 10b–5, and section 17(a)(1) of the 1933 Act, but need not establish *scienter* as an element of an action to enjoin violations of sections 17(a)(2) and 17(a)(3) of the 1933 Act. *Aaron v. Securities and Exchange Commission*, 446 U.S. 680, 701–02, 100 S.Ct. 1945, 1958–59, 64 L.Ed.2d 611 (1980). This court does not need to consider these distinctions, however, because aiding and abetting liability in and of itself requires a finding of *scienter*.

In this case, the court finds that there is a future likelihood, absent an issuance of an injunction, that future violations will occur. Zimmerman's conduct was repeated and of significant value. The repeated nature of his wrongdoings indicates a blatant disregard for securities laws and the sanctity of other people's money. Given his sophisticated business background and his continued denial of any wrongdoing, this court finds that the evidence provides sufficient grounds to support a permanent injunction to prevent further violations by Zimmerman.

### E. *Disgorgement*

■ This court may order an accounting and disgorgement of monies so as to prevent a defendant from profiting from his illicit conduct. *Blatt,* 583 F.2d at 1335; *Securities & Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1104 (2d Cir. 1972). Although disgorgement may not be used punitively, it is suited to deter violations and redress or cancel unfairness and promote investor confidence. *Blatt,* 583 F.2d at 1335; *SEC v. World Gambling Corp.,* 555 F.Supp. 930, 934 (S.D.N.Y.1983). Disgorgement certainly is merited in this case. All monies which Zimmerman realized came out of wholly illegitimate activities.

The SEC admits that it cannot determine the full extent of money realized by Zimmerman. The Commissioner states that at least $586,645.00 was converted or deposited into bank accounts controlled by Zimmerman. *See Securities & Exchange Commission v. First City Financial Corp., Ltd.,* 890 F.2d 1215, 1231 (D.C.Cir.1989) ("Disgorgement need only be a reasonable approximation of profits causally connected to the violation"). Just because Zimmerman may have spent or used this money to pay others or debts, however, will not prevent a disgorgement order in the full amount. After all, such a rule would permit the perpetrator of a successful scheme who was just as successful at dissipating the ill-gotten gains, to avoid a disgorgement order just because he had retained none of the proceeds. Rather, the only situation where a court will reduce or change a disgorgement figure put forth by the SEC is where the defendant demonstrated a clear break in the causal chain between the illegal activities and the ultimate gain. *First City Financial Corp.,* 890 F.2d at 1232; *Securities & Exchange Commission v. Hasho,* 784 F.Supp. 1059, 1111 (S.D.N.Y. 1992). No such break in the causal chain has been shown in this case. Disgorgement and an accounting, therefore, are appropriate.

### III. CONCLUSION

In light of the foregoing discussion, this court finds as follows: Plaintiff SEC's motion for summary judgment is GRANTED [39–1]. Plaintiff SEC's motion for an extension of time to file a pretrial order is DENIED as moot [47–1]. Defendant Zimmerman's motion for an extension of time to respond to the SEC's summary judgment motion is DENIED as moot [42–1]. The Clerk of Court is DIRECTED to ENTER JUDGMENT in favor of Plaintiff SEC and against Defendant Zimmerman.

The court further ORDERS AND ADJUDGES that a permanent injunction be entered restraining and enjoining Defendant Robert Zimmerman, his agents, servants, attorneys in fact, and those persons in active concert or participation with him who receive actual notice of the order of injunction, by personal service or otherwise, whether as principals or as aider and abetters, in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, from directly or indirectly: (a) employing any device, scheme or artifice to defraud; (b) obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon any purchaser of such securities; concerning but not limited to assisting another in the failure to purchase securities as instructed by his or her customers; assistance in preparation or actual preparation of any false statements, the unauthorized trading in a broker-dealer's customer's accounts,

the conversion and misappropriation of investors' funds in such accounts; and misstatements and omissions of similar purport and object.

Additionally, this court ORDERS AND ADJUDGES that a permanent injunction be entered restraining and enjoining Defendant Robert Zimmerman, his agents, servants, attorneys in fact, and those persons in active concert or participation with him who receive actual notice of this order of injunction, by personal service or otherwise, whether as principals or as aiders and abetters, in connection with the purchase or sale of any security by the use of any means or instrumentality of interstate commerce or of the mails from, directly or indirectly: (a) employing any device, scheme, or artifice to defraud; (b) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; concerning but not limited to those matters described in the preceding paragraph.

Defendant Zimmerman is ORDERED to make an accounting of the ill-gotten gains obtained as a result of the above-described conduct. He is also ORDERED immediately to disgorge funds in the amount $586,645.00, along with pre-judgment interest on that amount. Finally, the Clerk of Court is DIRECTED to DISMISS this action.

SO ORDERED.