672

PERKIN–ELMER CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–378C.

United States Court of Federal Claims.

Sept. 26, 2000.

Thomas C. Hill and Margaret T. Watkins, Washington, D.C., for plaintiff.

Michael F. Kiely, U.S. Department of Justice, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden, Director David M. Cohen, and Assistant Director Kathryn A. Bleecker, for defendant. Major Brent Curtis, Air Force Legal Services Agency, Arlington, VA, of counsel.

## OPINION

FIRESTONE, Judge.

This matter comes before the court on plaintiff's motion for summary judgment. In this action, plaintiff, Perkin–Elmer Corp. ("Perkin–Elmer"), appeals the final decision of the Air Force's Contracting Officer ("CO") demanding $8,315,253.80 plus interest for damages due to an alleged latent defect in certain wear metal analyzing instruments Perkin–Elmer manufactured for the Air Force.[1] Perkin–Elmer contends in its motion for summary judgment that the Air Force waited too long to revoke acceptance of the instruments under the applicable Federal Acquisition Regulations ("FAR") and case law, which require that action be taken within a "reasonable time" after the latent defects have become known. It is not disputed that the Air Force determined that the product was defective in 1991, but did not issue a final CO decision revoking acceptance until 1997. The Air Force argues that its actions in connection with the revocation were reasonable and timely. For the reasons that follow, the court concludes that under the undisputed facts of this case the

1. For the purposes of its motion only, plaintiff does not deny that the wear metal analyzers contained a latent defect.

Air Force did not act within a "reasonable time." Accordingly, Perkin–Elmer's motion for summary judgment is **GRANTED**.

## FACTS

The facts are not in dispute and may be summarized as follows. In 1982 the Air Force awarded Perkin–Elmer an initial contract for the design and development of a portable wear metal analyzer ("PWMA") prototype. PWMAs are instruments designed to evaluate the condition of aircraft engines by analyzing the concentration of various metals in the engines' oil. PWMAs allow the Air Force to determine which engine parts are deteriorating and, therefore, need to be replaced. At the time of the contract, the Air Force needed a fairly large machine to conduct the analysis. The value of a portable analyzer is that it can be carried by one person and used in the field.

Following design of the prototype PWMA, the Air Force in 1986 awarded Perkin–Elmer contract no. F41608–86–D–0273, for the production of the PWMAs. Between 1988 and 1990, the Air Force took delivery of 133 PWMAs. Although the Air Force had accepted the PWMAs, problems with the instruments surfaced in 1991, when the Air Force tested them prior to deployment. These concerns led the Air Force to hire the Southwest Research Institute ("SwRI") of San Antonio, Texas to test ten of Perkin–Elmer's PWMAs. In September 1991, SwRI issued its report in which it concluded that all ten of the PWMAs it tested failed to meet the contractual requirements. In particular, SwRI noted that the PWMAs did not produce accurate results and, thus, could not be relied upon in the field.

In December 1991 and again in January 1992, the Air Force wrote to Perkin–Elmer stating that the PWMAs "cannot be used to satisfy the Government's requirements," and that the Air Force might exercise its "contractual remedies" against Perkin–Elmer. During 1993, the division of Perkin–Elmer that produced the PWMAs was purchased by Orbital Science Corp. ("Orbital Science"). Subsequently, the Air Force, Perkin–Elmer, and Orbital Science attempted to settle the dispute over the PWMAs by having Orbital

Science buy back the PWMAs from the Air Force. These settlement efforts eventually failed.

During this same time period, the Air Force Office of Special Investigation began investigating whether to pursue a possible False Claims Act, 31 U.S.C. §§ 3729–3731 (1994), case against Perkin–Elmer based on the problems concerning the PWMAs. By March 27, 1995, however, the government had decided not to file a False Claims Act case against Perkin–Elmer. Perkin–Elmer was notified of the government's decision not to file the False Claims Act case some time before March 1995.

More than one year later, on May 10, 1996, the Air Force issued a demand letter to Perkin–Elmer revoking acceptance of the PWMAs and seeking $8,315,253.80. The letter stated that the demand was based on "[p]ost-acceptance testing [that] was conducted for the Air Force by Southwest Research Institute (SwRI) during the period 7 June through 30 September 1991." The demand letter restated SwRI's 1991 conclusion that "[p]ost delivery testing of a sample of ten Portable Wear Metal Analyzer (PWMA) spectrometers delivered under the contract resulted in the finding that the units do not meet contract requirements...." Thereafter, according to the CO's assertion in her final decision, an attempt to re-open settlement negotiations in June 1996 failed.

More than another year passed until July 1997, when the Air Force hired Stephen W. Mabie, an engineering consultant, to pinpoint the reason for the variation in test results between the Air Force's testing and Perkin–Elmer's testing. The expert concluded that Perkin–Elmer had used the wrong testing protocol. After receiving the expert report, the CO issued a final decision on October 25, 1997, alleging that Perkin–Elmer had "unilaterally changed the methods used during Acceptance Testing" and had used "a non-compliant oil injector during testing." The letter stated:

> My view, as Contracting Officer, is that none of the PWMAs delivered by Perkin–Elmer met the requirement of the contract. Perkin–Elmer's proposal promised to comply with existing drawings and sup-

ply a pre-production prototype. Approval by the Government Quality Assurance Evaluator (QAE) was based on a data package which included certificates of conformance and test data. Subsequent to acceptance, extraordinary Government testing disclosed that the PWMAs do not perform in accordance with contractual requirements. Further, investigation has disclosed that Perkin–Elmer unilaterally changed the methods used during Acceptance Testing to ensure that it obtained passing results.

Information developed by the Government led to concerns that the PWMAs you delivered to the Air Force did not meet contract specifications. Post-acceptance testing was conducted for the Air Force by Southwest Research Institute (SwRI) during the period 7 June through 30 September 1991. Testing of a sample of ten Portable Wear Metal Analyzer (PWMA) spectrometers delivered under the contract resulted in the finding that the units do not meet contract requirements in the areas of repeatability, and accuracy.

The CO reiterated her demand for the amount of $8,315,253.80 "for the debt owed by Perkin Elmer concerning this matter" and informed Perkin–Elmer that it could appeal her decision to the Armed Services Board of Contract Appeals or the Court of Federal Claims. Plaintiff filed the present action on April 17, 1998. Defendant filed its counterclaim on November 30, 1998.

The parties conducted discovery regarding whether the government's revocation was made in a reasonable time. Thereafter, plaintiff moved for summary judgment. Briefing was completed and oral argument was heard on September 21, 2000.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390

(Fed.Cir.1987). In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. Here, the issue for summary judgment is whether the government acted within a reasonable time after learning of the alleged defective product. The determination of whether the government acted within a reasonable time is a question of law that can be decided on summary judgement where there are no facts in dispute. *See Paine v. Central Vt. R.R. Co.,* 118 U.S. 152, 6 S.Ct. 1019, 30 L.Ed. 193 (1886); *Traylor Bros.,* ENGBCA No. 5884, 99–1 BCA ¶ 30,-136, at 149,073 (1998).

### II. Latent Defects

The law governing the rights of the government with respect to latently defective goods is well-settled. Under FAR 52.246–2(j), "[t]he Government shall accept or reject supplies as promptly as practicable after delivery, unless otherwise provided in the contract." 48 C.F.R. § 52.246–2(j). If the Government accepts supplies after delivery, its acceptance is "conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract." *Id.* § 52.246–2(k).

Where latent defects in manufactured articles are found, the government has a "reasonable time" to take action and assert a claim. *Bar Ray Prods., Inc. v. United States,* 162 Ct.Cl. 836, 837–38, 1963 WL 8524 (1963). "In order to revoke acceptance of the supply, the government must assert its claim in a timely manner, and prove by a preponderance of the evidence that a latent defect existed at the time of final acceptance which was hidden from knowledge as well as sight, and could not be discovered by the exercise of reasonable care." *Spandome Corp. v. United States,* 32 Fed.Cl. 626, 630 (1995) (citing *United Techs. Corp. v. United States,* 27 Fed.Cl. 393, 398 (1992)). Although the government must assert its claim in a timely matter, the government acts reasonably when it delays revocation of acceptance in order to determine conclusively that sup-

plies do not comply with contractual specifications, or the Government works with a contractor to solve the problem. *See Jung Ah Indus. Co.*, ASBCA No. 22632, 79–1 BCA ¶ 13,643, at 66,929 (1979).

■ The contract boards that have examined the issue of whether the government's revocation was "timely" have uniformly held that the government must act within a relatively short period of time after learning of the defect. The boundaries of that time period do not lend themselves to a precise formula, but guideposts have been set by earlier decisions. In *Ordnance Parts & Eng'g Co.*, ASBCA No. 40293, 90–3 BCA ¶ 23,141 (1990), the Armed Services Board of Contract Appeals reviewed a CO's final decision revoking acceptance of 300 "towing eyes." In sustaining the contractor's appeal, the board found that a delay of one year between the CO's request for tests to determine whether or not the towing eyes contained a latent defect and the CO's final decision was not "remotely prompt action." *Id.* at 116,187. Similarly, in *Utley–James, Inc.*, GSBCA No. 6831, 88–1 BCA ¶ 20,518 (1987), the General Services Board of Contract Appeals found that a delay of two and a half years between the CO's receipt of an expert report detailing a latent defect in the contractor's construction work and the CO's final decision was "unreasonable." *Id.* at 103,726. The board reached this decision despite the fact that the CO had provided notice to the contractor of the defects two years before issuing its final decision.[2] *See id.* at 103,721.

Perkin–Elmer argues based on the foregoing authorities that the Air Force's decision to wait more than 6 years from learning of the defect to issuing a final decision revoking

acceptance was not timely as a matter of law, and, thus, the CO's claim must be denied. Perkin–Elmer argues that the correct time period to evaluate the reasonableness of the government's actions is between September 1991, when the Air Force learned of the alleged defect following the issuance of the SwRI report, and October 25, 1997, when the CO revoked acceptance. Perkin–Elmer states that the CO herself admitted that she became aware of the defect in 1991. When asked in depositions "when the Air Force became aware that there was a latent defect," the CO replied that "[i]t became apparent in '91."

The Air Force argues in response that the relevant time period for measuring the government's "timeliness" is from July 1997, when Mr. Mabie, the CO's expert engineer, presented his report to the CO explaining why there was a discrepancy between Perkin–Elmer's and the government's testing, to October 25, 1997, when the CO issued her final decision, a period of only three months. Defendant argues that because the Air Force did not learn the precise reason for the "defect" until 1997, when it received Mr. Mabie's expert report, the court should not look back to 1991, as Perkin–Elmer contends.

Alternatively, defendant argues that even if the Air Force's revocation of acceptance on October 25, 1997, was based upon a latent defect first discovered in September 1991, the government's actions were in any event still "reasonable" given its contractual relationship and lengthy history with Perkin–Elmer. The government argues that it delayed revocation of acceptance not only to establish conclusively the bases for the defects but also to work with the contractor to solve the problem. *See Jung Ah Indus.*, 79–

---

2. Defendant cites *P & Z Shea (JV)*, ENGBCA No. 5613, 98–2 BCA ¶ 29,947 (1998) for the proposition that a six year delay between the discovery of a latent defect and the CO's final decision revoking acceptance was not unreasonable where the contractor had earlier written notice that the agency was investigating a latent defect. *P & Z Shea* does not stand for this proposition. The decision in *P & Z Shea* was written in response to the contractor's motion for summary judgment, in which the contractor asked the board to find that a delay of six years was unreasonable "as a matter of law." *See id.* at 148,170.

Because of unresolved factual issues regarding what transpired between the parties during that six year delay, the board declined to find that the delay was unreasonable as a matter of law. *See id.* Thus, this case does not stand for the proposition that it is reasonable to wait six years between discovery of a latent defect and issuance of a final decision where the contractor has notice that revocation may occur. Moreover, as seen in *Utley–James* above, notice to the contractor of possible latent defects does not relieve the government of its obligation to act in a timely manner in revoking acceptance.

1 BCA at 66,929. In particular, the government notes that between 1991 and 1994 it conducted an extensive investigation of Perkin–Elmer's manufacture and testing of the PWMAs, subpoenaed voluminous documents, questioned Perkin–Elmer employees, and engaged in settlement discussions with Perkin–Elmer. Further, the government notes that it issued a "demand letter" to Perkin–Elmer on May 10, 1996, more than a year before it issued its final decision. In light of these undisputed facts, the government argues that its delay was justified because Perkin–Elmer was on notice of the government's concerns and was engaged in a process with the government to resolve those concerns.

The court finds, as a matter of law, that the government's revocation, which came more than six years after it first learned of the alleged defect, was not timely. The undisputed evidence clearly establishes that the Air Force was aware of the alleged defects in the PWMAs following receipt of the SwRI report in 1991. The SwRI report unequivocally stated that the PWMAs were "unacceptable and do not perform to expectations, particularly for samples with higher concentrations of wear metals." Indeed, the CO, Herminia Ruiz, confirmed in her testimony that the Air Force knew of the alleged latent defect in the PWMAs in 1991. In such circumstances, the government's contention that it needed Mr. Mabie's expert report before it could revoke acceptance is wholly unpersuasive. Although it is true that the government acts reasonably when it delays revocation of acceptance in order to determine whether goods are in fact defective, the Mabie report was not needed to establish a defect conclusively. The government already knew that the PWMAs were defective. The Mabie report simply explained why Perkin–Elmer's and SwRI's test results varied. The government cannot justify its delay based on its contention that it did not know of the extent of the defect until it received the Mabie report.

The government's contention that the delay was justified in light of its on-going relationship with Perkin–Elmer also fails as a matter of law. First, the undisputed facts show that as of December 20, 1991, the government stopped working with Perkin–Elmer to fix the PWMAs. See December 20, 1991 Letter from CO Eva H. Atkins to Perkin–Elmer (informing Perkin–Elmer that it "should not expend any additional effort to change these units"); see also January 22, 1992 Letter from Acting Section Chief Evelyn S. Meyer to Perkin–Elmer (stating that "it is not economically feasible to modify the PWMA to meet the current test requirements"). Thus, the government cannot justify its delay based on its contention that the parties were endeavoring to solve the problem with the PWMAs with Perkin–Elmer.

Second, although the government and Perkin–Elmer engaged in some settlement negotiations in 1992 and 1993, those discussions concluded in 1993, more than three years before the government issued the demand letter and more than four years before it finally revoked acceptance. Thus, the delay in revocation cannot be justified on the grounds that the parties were endeavoring to settle the matter.

Third, the period in which the government claims it was conducting a civil investigation of Perkin–Elmer under the False Claims Act does not justify the delay beyond the close of that investigation. The government waited more than two years after it decided not to pursue a False Claims Act action against Perkin–Elmer to revoke acceptance. Defendant has not presented evidence to show why it took more than twelve months following the close of the investigation to notify Perkin–Elmer of its breach claim, or why it then waited another thirteen months after that to hire an expert to reassess the claim before finally revoking acceptance on October 25, 1997.

In this connection, the present case is strikingly similar to the facts presented in *Ordnance Parts & Eng'g Co.*, ASBCA No. 40293, 90–3 BCA ¶ 23,141. As explained briefly above, in *Ordnance Parts* a contractor manufactured 300 vehicle "towing eyes" for the government, which the government accepted on September 30, 1985. In September 1987, the government identified problems with the towing eyes. However, because of doubt as to whether the contractor was bankrupt, it did not take action against the con-

tractor. *See id.* at 116,187. Although the government finally determined that the contractor was not bankrupt in February 1989, the government did not hire an independent testing company until November 22, 1989, ten months later. It took the testing laboratory less than two weeks to issue its opinion. The CO's final decision revoking acceptance was issued in January 1990. In concluding that the government had waited too long to revoke acceptance, the board stated that "although it took only two weeks to determine the cause of the failures, it took the Government from February 1989 to January 1990, nearly a year, to conduct its investigation." *Id.* The board found that a period of ten months between the identification of the problem and the hiring of a testing laboratory to determine the exact cause of the defects, followed by another month of delay for the final decision was not "remotely prompt action." *Id.*

The court finds the same is true here. Even if one accepts the government's premise that the decision to delay revocation for four years in order to investigate Perkin–Elmer's actions under the False Claims Act was reasonable, the government's failure to act promptly following its decision not to pursue a False Claims Act action was not reasonable. The court therefore finds that, where as here, the government (1) admittedly knew that the product was defective in 1991, (2) informed plaintiff in 1991 that it was considering taking action regarding the defect, (3) spent four years investigating the product and the problems associated with its effectiveness in connection with a possible False Claims Act action, (4) informed plaintiff in the beginning of 1995 that it had decided not to pursue a False Claims Act case, (5) waited more than one year thereafter to inform plaintiff of its intent to assert a breach claim based on grounds known since 1991, and (6) then waited more than another year to hire an expert and to finally revoke acceptance, it has not acted within a reasonable time. In the circumstances of this case, the government should have acted expeditiously following its decision not to pursue a False Claims Act action to inform Perkin–Elmer of its intent to assert a breach claim. Indeed, the record shows that the CO re-

sponsible for the matter in 1995 and early 1996 had begun to work on a demand letter but did not finish it before another CO came on board. The government did not offer any evidence to explain why it waited more than a year to issue a demand letter on a product it had known to be defective for more than four years. Similarly, the government did not offer any evidence to explain why it thereafter waited thirteen months to hire an expert to reassess its claim, which delayed the revocation for more than another year. In such circumstances, the government's delay in asserting its breach claim was not reasonable as a matter of law.

## CONCLUSION

In view of the foregoing, the court finds, as a matter of law, that the Air Force did not assert its claim against Perkin–Elmer within a reasonable time when it waited over six years between discovering the alleged latent defect and finally revoking acceptance. Accordingly, Perkin–Elmer's motion for summary judgment is **GRANTED** and defendant's counterclaim is **DISMISSED**. Each party shall bear its own costs.