**LION RAISINS, INC., Plaintiff,**

v.

**THE UNITED STATES, Defendant.**

No. 01–322C, 01–536C.

United States Court of Federal Claims.

Dec. 14, 2001.

Brian C. Leighton, Clovis, CA, for plaintiff.

Brian L. Owsley, Washington, DC, with whom was Assistant Attorney General Rob-

ert D. McCallum, Jr., for defendant. Michael Gurwitz, United States Department of Agriculture, of counsel.

## *OPINION*

MILLER, Judge.

These consolidated cases are before the court after argument on cross-motions for summary judgment. Plaintiff raisin manufacturer was suspended from bidding on government contracts for a period of one year after a government investigation determined that plaintiff had falsified three United States Department of Agriculture (the "USDA") certificates. At issue is whether the USDA acted arbitrarily and capriciously in taking this action.

## FACTS

Except as noted, the following facts are undisputed.[1] Lion Raisins, Inc. ("plaintiff"), is a family-owned and operated business that grows and markets raisins. In addition to selling raisins to private enterprises, plaintiff successfully has bid on more than 20 contracts awarded by the USDA over the past decade. Plaintiff was awarded and successfully completed five of these contracts from May 26, 1999, to the present.[2]

On November 22, 2000, the USDA issued an invitation for raisin handlers to bid on two government contracts for school lunch programs, Invitation 923 and Invitation 924, with a combined tonnage of approximately 7,000 tons. Bids were to be received by December 11, 2000, and plaintiff timely bid on both

invitations. The USDA was to announce acceptances by the close of business on January 17, 2001.

Unknown to plaintiff, after the USDA received plaintiff's bids, it contacted the U.S. Small Business Administration (the "SBA") to request a Certificate of Competency ("COC") for plaintiff. In a December 14, 2000 letter, Susan E. Proden, Contracting Officer for the USDA, informed the SBA that the USDA believed plaintiff would be the successful bidder for the contracts.[3] However, the USDA requested a COC for plaintiff because the USDA's compliance office, the Agricultural Marketing Service (the "AMS"), just completed a preliminary investigation of plaintiff which revealed that certain raisin certifications had been falsified. The specific irregularities were that USDA inspector signatures had been forged and false moisture content readings were recorded. On at least one certificate, the grade of raisins had been changed from Grade C to Grade B. Further, the investigation determined that, over a three-year period, plaintiff fraudulently had received more than it was entitled to receive under government programs administered by the Raisin Administrative Committee. Ms. Proden also informed the SBA that the USDA had received numerous calls from the raisin industry accusing plaintiff of being a "large business," contrary to plaintiff's assertion it was a "small business," and thus the USDA had also initiated a size protest regarding plaintiff.

According to the complaint, plaintiff became aware of the AMS investigation as a result of the SBA's competency and size in-

1. While neither party asserts that genuine issues of material fact exist, defendant moved to strike plaintiff's reply to defendant's response to plaintiff's proposed statement of uncontroverted facts on grounds that such a reply is prohibited by RCFC 56.1. This rule contemplates that a moving or cross-moving party file a statement of facts and the opposing party file a counter-statement of facts. Defendant is correct that the rule does not contemplate the filing of a reply brief because it would be inappropriate for a plaintiff to address a genuine issue of material fact raised by a defendant in opposition by proposing additional facts. However, the rule does not prohibit the filing of a reply statement. Because plaintiff's filing does not propose any facts additional to those already submitted in its statement of facts, the court chooses to allow it as a curative to

defendant's counter-statement, which rotely denied plaintiff's proposed findings as conclusions of law or reiterations of writings.

2. Aug. 10, 1999, 198.72 tons; Nov. 1, 1999, 158.98 tons; Nov. 15, 1999, 278.21 tons; May 5, 2000, 238.46 tons; and May 16, 2000, 119.23 tons.

3. Although neither invitation referenced a set-aside for small businesses, the SBA is authorized independently to enter into procurement contracts on behalf of qualified small business concerns. 15 U.S.C. § 637(a) (1994). The pleadings do not elaborate on the SBA's assistance to plaintiff regarding these or any other government contracts.

quiries.[4] Plaintiff alleges that the USDA refused to provide either plaintiff or the SBA with additional facts about its investigation. On January 2, 2001, the SBA informed plaintiff that the due date for the COC had been suspended pending the USDA's release of its preliminary investigation report.

On January 12, 2001, Dr. Kenneth C. Clayton, AMS Associate Administrator for the USDA, issued a decision that suspended plaintiff from participating in government contracts for a period of one year. Dr. Clayton identified as grounds for the suspension the falsification of inspectors' signatures and false moisture content readings on two USDA certificates and the change of grade of raisins on one certificate. He concluded that these falsifications constituted "commission of any other offense indicating a lack of business integrity or business honesty that seriously and directly affect[ed] the present responsibility" of plaintiff, a ground for suspension set out in 48 C.F.R. (FAR) § 9.407–2(a)(7) (2000).[5] The January 12 letter did not provide plaintiff with any other details of the investigation. The USDA published a press release the same day announcing the suspension and reporting that the USDA also had filed an administrative complaint to deny inspection services to plaintiff. The press release disclosed the fact that the inspection certificates at issue were related to raisins exported in 1998.

On January 16, 2001, plaintiff informed the USDA that it requested a hearing on the suspension decision. At that time it also asked for a copy of the USDA's investigation report and demanded documents to assist it in preparing to argue against the suspension. Plaintiff then filed suit in the United States District Court for the Eastern District of California (Fresno) in an attempt to prevent the USDA from awarding the two raisin contracts. On January 17, 2001, the USDA awarded the raisin contracts to bidders not now identified by the parties. The USDA subsequently withdrew the award of the contracts referred to in Invitation 924 because of a defect in the bidding process.

On January 19, 2001, in response to an order by the Fresno district court, the USDA provided plaintiff with a redacted copy of its Report of Investigation dated May 26, 1999 (the "USDA Report"). The USDA explained that it produced "only the portions of the report that relate to the allegations that led to the suspension. Most of the redactions concerns [sic] a different allegation that was not the basis for the suspension." The USDA Report states that on February 20, 1998, an officer of the USDA's Fresno inspection office received an anonymous tip that Bruce Lion, plaintiff's Vice President, falsified plaintiff's inspection certificates. According to the tipster, plaintiff kept a supply of unsigned certificates that were forged when raisins failed to meet a buyer's specifications. The USDA was told to look for certificates issued to certain overseas buyers for evidence of falsification. An internal USDA investigation revealed that, from January 1996 through July 1998, 13 inspection certificates assigned to plaintiff were unaccounted for by USDA records. The AMS also requested copies of USDA certificates, bills of lading, and receipts of shipments from 109 of plaintiff's foreign customers. Eight responded with copies of USDA inspection certificates. The AMS interviewed the USDA inspectors referenced on those certificates and determined that two of the certificates had been forged. Those same two certificates reported moisture levels lower than those recorded in the inspectors' handwritten line check sheets. Moreover, neither appeared on the USDA's register of issued certificates. A third certificate bore a verified USDA signature, but indicated the raisins shipped were of Grade B when the copy in the USDA's possession indicated that the raisins were Grade C.

Plaintiff's hearing was held on February 1, 2001, at the USDA's headquarters in Washington, DC. Dr. Clayton and others from the AMS were present. Plaintiff was informed

---

4. Plaintiff was already aware of a separate criminal investigation. The parties represent that in October 2000 investigators had raided plaintiff's offices in conjunction with that investigation.

5. Although FAR § 9.407.2(a)(3) provides that falsification of records is itself cause for suspension, Dr. Clayton did not rely on this provision to support plaintiff's suspension.

that the purpose of the hearing was to afford plaintiff the opportunity to present to the USDA "what Lion Raisins has done, what it's currently doing and what Lion Raisins plans to continue doing to assure the Department that it is a responsible business." Transcript of Proceedings, *Lion Raisins, Inc. v. USDA*, at 16 (Dept.Agric.Feb. 1, 2000). Plaintiff was also told that the USDA would be presenting no witnesses or other evidence and that plaintiff would not be allowed to question Dr. Clayton.

When asked to speculate on the source of the forged certificates, Mr. Lion explained that, nine days before the USDA received the anonymous tip, he had fired a long-time employee who had requested a share in plaintiff's profits when Mr. Lion discovered that he had interviewed with plaintiff's competitors. Subsequently, that employee's friend and assistant in January 2000 had been convicted of forging Mr. Lion's signature on checks made out to himself. Mr. Lion opined that they were two of the individuals who were in a position to be responsible for the falsification of certificates. When asked to speculate further, Mr. Lion posited that while neither employee had any apparent financial motive to falsify the certificates, they may have done so merely to rectify a discrepancy in the documents. He also explained that of the eight other people who worked in plaintiff's shipping department in 1998, only one or two remained. Mr. Lion interviewed them about the falsification, but no new information was revealed. He also posited, albeit less explicitly, that the USDA inspectors may have themselves been responsible for any discrepancies in the certificates, as Mr. Lion had been informed that the USDA inspectors often would leave before the end of plaintiff's production day and later merely would copy plaintiff's own quality control work or simply make up results.

Mr. Lion explained that in 1998 it was the USDA's practice to have plaintiff's own clerks actually type USDA certificates, necessitating plaintiff's possession of blank inspection certificates. That practice was eliminated during November 2000, when the USDA bought its own computer hardware to complete the certificates. Following the USDA Report, Mr. Lion implemented a procedure whereby all paper work is double-checked by others. Using this new procedure, Mr. Lion discovered, for example, that his administrative assistant had forged his father's name on a document. Plaintiff also moved into a new facility in July of 1999 where operations, including inspections, are videotaped 24 hours a day. Previously, tapes would be re-used after being reviewed. The current practice is to keep the tapes indefinitely. As part of its new operations, plaintiff introduced a new inspection process designed to raise quality control standards, and employees now receive a $50.00 bonus for each report of a manufacturing infraction.

In a final decision and order dated February 5, 2001, Dr. Clayton found plaintiff's testimony and records unpersuasive. He concluded that plaintiff could not show its present responsibility as a government contractor and upheld the suspension.

On March 28, 2001, the Fresno district court preliminarily enjoined the USDA from awarding to any other bidder any contracts upon which plaintiff was the low bidder. Plaintiff subsequently was awarded the contract on Invitation 924, as well as three additional contracts.

Plaintiff sued in the Court of Federal Claims, alleging breach of implied contract as to Invitation 923 and seeking lost profits and costs from the USDA's refusal to consider its bid. The Government thereafter successfully moved in the Fresno district court to dismiss for lack of jurisdiction plaintiff's bid protest as to Invitation 924. Plaintiff re-filed in the Court of Federal Claims, and the cases were consolidated on November 19, 2001. Jurisdiction is met under the Tucker Act, 28 U.S.C. § 1491(b) (1994 & Supp. V 1999). In the interim the USDA reinstated plaintiff's suspension. The agency's November 15, 2001 letter explained that the stay of suspension imposed by the Fresno district court had become moot upon transfer.

Plaintiff now seeks summary judgment as to its claim for breach as to Invitation 923, arguing that the USDA's decision to suspend plaintiff was arbitrary, capricious, an abuse of discretion, and not in accordance with the law. Defendant cross-moves for summary

judgment on the administrative record and also moves to strike two declarations submitted by plaintiff in support of its motion. It further moves for summary judgment on plaintiff's prayer for lost profits on the contract, arguing that plaintiff's recovery is limited by statute to bid preparation and proposal costs. Plaintiff, in turn, moves to strike a declaration submitted by defendant with its motion.

By separate motion plaintiff also seeks a preliminary injunction or temporary restraining order which would in effect suspend its suspension until such time as this court decides the merits of plaintiff's case. Defendant objects, arguing *inter alia*, that plaintiff's motion seeks relief for alleged injury arising from future procurements unrelated to the bids before the court in this case and therefore must be based on a new complaint. Defendant also moves to dismiss plaintiff's claim partially as to Invitation 924, a motion that is not now before the court. Plaintiff thereafter attempted to file an amended complaint that conformed to defendant's objections. Because RCFC 15(a) prohibits the plaintiff's right to file an amended complaint as a matter of course once a responsive pleading is made, the Clerk of the Court properly refused to accept plaintiff's amended complaint without judicial leave.

## DISCUSSION

### 1. *Preliminary injunction*

The Tucker Act, 28 U.S.C. § 1491(b)(2), affords the court jurisdiction in a bid protest case to "award any relief that the court considers proper, including declaratory and injunctive relief." In a pre-award bid protest case, this provision affords the court authority to prevent the Government from awarding a contract to another bidder pending resolution of a plaintiff's protest. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1331–32 (Fed.Cir. 2001). Plaintiff's motion, however, refers to no impending invitation for bids on which it is unable to bid due to the suspension. Further, plaintiff avers that the terms of the suspension do not prevent it from fulfilling its existing government contracts. Plaintiff therefore cannot establish that any irrepara-

ble injury would occur should it be denied a preliminary injunction. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993) (enumerating standards for issuance of a preliminary injunction). Although irreparable injury is but one factor in the court's assessment of the propriety of injunctive relief, plaintiff is silent on the other necessary factors: the likelihood of success on the merits, the respective balance of hardships, and the interest of the public. *See id.; Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed.Cir.1983).

Defendant also contests whether plaintiff yet has suffered an injury sufficient to satisfy the constitutional doctrines of standing and ripeness. Plaintiff counters that the suspension is independently injurious of plaintiff's reputation. Nonetheless, even assuming such injury in fact exists, the Tucker Act does not afford the court jurisdiction to remedy the tort of injury to reputation. 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction ... in cases not sounding in tort."); *see, e.g., Alves v. United States*, 133 F.3d 1454, 1459 (Fed.Cir.1998). Nor does the court have independent jurisdiction to remedy the wrongful suspension. *IMCO, Inc. v. United States*, 97 F.3d 1422, 1425 (Fed.Cir.1996); *ATL, Inc. v. United States*, 736 F.2d 677, 681–82 (Fed.Cir.1984).

Moreover, the fact that the Fresno district court attempted to award a preliminary injunction in this case is of no moment. In accordance with the doctrine of the law of the case, federal courts will in most circumstances attempt to adhere to prior orders issued by a transferring court, even when that court lacked subject matter jurisdiction. *Suel v. Sec'y of HHS*, 192 F.3d 981, 986 n. 2 (Fed.Cir.1999); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 756 F.2d 162, 163–64 (D.C.Cir.1985). To enforce those orders, however, the transferee court must itself entertain subject matter jurisdiction over those orders. "Courts created by statute can have no jurisdiction but such as the statute confers." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988). While the Fresno dis-

trict court may have had the power to lift plaintiff's suspension and freeze the status quo in the case before that court, the Court of Federal Claims lacks such a general equitable power. "We may exercise equitable powers as an incident to our general jurisdiction, for example, reforming a contract and enforcing it as reformed in an action at law. But our general jurisdiction under the Tucker Act does not include an action for 'specific equitable relief.' ..." *Carney v. United States*, 199 Ct.Cl. 160, 163–64, 462 F.2d 1142, 1145 (1972).

After briefing on this motion was completed and oral argument heard, plaintiff filed a motion requesting leave to file additional evidence. When the parties were participating in oral argument on December 10, 2001, the USDA announced Invitation 054, which requests bids for three raisin contracts. Bids are due December 18, 2001, and contracts are to be awarded December 28, 2001. The opening of a new bid confers the court with jurisdiction to entertain a motion for a preliminary injunction. However, because the court, based on the pending motions, has resolved the merits of plaintiff's case in its favor, the issue of an injunction is now moot.

### 2. *Supplements to the administrative record*

In its motion for summary judgment, plaintiff seeks to supplement the administrative record with the declarations of Bruce Lion, Vice President of Lion Raisins (the "Lion Declaration"), and Brian C. Leighton, plaintiff's attorney of record (the "Leighton Declaration"). Defendant moves to strike these declarations, arguing that they fail to meet the standards for supplementing the administrative record and fail to conform with the standards of admissibility under RCFC 56(f). While defendant purports to then cross-move for summary judgment on the basis of the administrative record, it attached to its motion the declaration of Eric M. Forman, Associate Deputy Administrator for Fruit and Vegetable Programs, AMS, USDA (the "Forman Declaration"). Plaintiff, in turn, has moved to strike the Forman Declaration as outside the administrative record.

Because a court reviews an agency decision under the "arbitrary and capricious" standard set forth in 5 U.S.C. § 706(2)(A) (2000), judicial review of agency actions generally is limited to the administrative record. 28 U.S.C. § 1491(b)(4); *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed.Cir. 2000). The administrative record, however, is not a certified, formal record. The Court of Federal Claims, therefore, does "not apply an iron-clad rule automatically limiting its review to the administrative record." *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997).

> Initially, the judge should determine whether the agency action before the court is susceptible to a record review. If the answer is yes, the judge must limit review to the record. If the answer is no, however, the judge should recognize the long lineage of cases recognizing the need to supplement the administrative record in certain circumstances.

*Id.* at 780. A party may supplement the administrative record when necessary to prove that evidence not in the administrative record was, or should have been, considered, is evidence without which the court cannot fully understand the issues. *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 342 (1997); *see also Impresa*, 238 F.3d at 1337–38 (explaining circumstances under which court may compel agency to explain basis for administrative decision).

The Lion and Leighton Declarations can be viewed as cumulative and unnecessary supplementation of the administrative record. Eight of the 13 exhibits attached to the Lion Declaration are already part of the administrative record, and 12 of the 25 paragraphs merely refer to that record. Of the remaining five exhibits, two already are part of the trial record by virtue of attachment to plaintiff's complaint and are relevant to the court's understanding of the procedure of this case but not to the court's understanding

of the decision to suspend. The two that relate to plaintiff's estimated profits and the one that is a copy of the Fresno district court's preliminary injunction order all are similarly irrelevant to assessing the propriety of plaintiff's suspension. The remainder of Mr. Lion's sworn testimony parrots legal allegations in the complaint or otherwise supports plaintiff's claim for lost profits. As for the two exhibits attached to the Leighton Declaration, one is the transcript of the February 1, 2001 suspension hearing and the other is a copy of the Government's opposition to the granting of a preliminary injunction by the Fresno district court, which is essentially the same as defendant's opposition to summary judgment here and contains the same Forman Declaration. Mr. Leighton's six paragraphs of sworn testimony reiterate the information in these exhibits and add nothing to the court's review of the suspension decision. Although they are for the most part cumulative, the court will allow plaintiff's two declarations as "useful, but innocuous ... guide[s] to documentary justification already in existence." *Cubic Applications*, 37 Fed.Cl. at 343.

The Forman Declaration, tendered by defendant in opposition to plaintiff's summary judgment motion, does present new evidence. Mr. Forman explains that, after completion of the USDA's investigation into plaintiff, the Office of the Inspector General (the "OIG") in May 1999 instituted a criminal investigation of plaintiff. According to Mr. Forman, the USDA did not suspend plaintiff until January 2001 because it is "standard procedure" of the AMS "to take no administrative action until the potential criminal action is resolved." Declaration of Eric M. Forman filed Oct. 15, 2001, ¶ 3. In this case, however, the investigation was still ongoing when the AMS decided to suspend plaintiff. Mr. Forman elaborates that it was the forthcoming purchase of "large volumes of raisins in 2001," *id.* ¶ 4, that led the AMS to query the OIG whether suspension could be instituted without prejudicing the investigation. The OIG gave clearance, and the suspension was put into effect.

 "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the United States. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); accord *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *U.H.F.C. Co. v. United States*, 916 F.2d 689, 700 (Fed.Cir.1990) (court must review only rationale put forth by agency in support of its action). The court must examine carefully defendant's submission of material outside the administrative record and determine whether it assists the court in understanding that decision or is merely a post hoc rationalization offered by the agency or its counsel.

 Review is limited to consideration of evidence relevant to the substantive merits of the agency's action "for the limited purposes of ascertaining whether the agency ... fully explicated its course of conduct or grounds for decision." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980). Because the Forman Declaration assists the court in understanding the sequence of events that preceded the suspension, the court will allow it for that limited purpose. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989). However, the Forman Declaration does not illuminate the reasoning of Dr. Clayton, the suspending official. Rather, it provides a new and alternative rationale. Specifically, Mr. Forman declares that he is Associate Deputy Administrator of the AMS and that in that capacity he received both a copy of the USDA Report and a letter requesting a criminal investigation of plaintiff. He explains that, based on those reports "we were concerned about continuing to do business with this company," "we formally requested ... an administrative complaint," and "we were advised that we could continue to take administrative action." Forman Decl. ¶¶ 4, 6, 7. The identity of this collective "we" and Mr. Forman's personal role in its activities are not explained. While Mr. Forman was present at the suspension hearing, he does not attest to the fact that he assisted Dr. Clayton, the suspending official, in any other capacity.

Of more importance, the Forman Declaration contradicts the USDA's proffered rationale for plaintiff's suspension and to that

extent is the quintessential post hoc rationalization. According to their respective titles, Mr. Forman is Dr. Clayton's assistant. The former's declaration may have been intended to convey that the existence of the investigation was not known to Dr. Clayton, although Dr. Clayton, of course, is chargeable with the information known by his assistant, and both were present at the hearing. The USDA repeatedly underscored at plaintiff's hearing that every factor related to plaintiff's suspension could be found in the redacted USDA Report. Indeed, Mr. Lion abruptly was reminded of that fact when he attempted to comment on additional compliance concerns raised by the USDA's December 14, 2000 letter.[6] Yet, Dr. Clayton's detailed post-hearing decision and order upholding the suspension contain no statement that anything about the suspension was related to a criminal investigation or to the impending award of a large-volume raisin contract. As to the timing of the suspension, Dr. Clayton stated:

> Although Lion's equitable argument has some appeal, it is well settled that the federal government cannot be estopped on the same terms as a private party, and has therefore not waived its right to suspend Lion from participating in government contracts now simply because it did not issue the suspension letter promptly. In addition, as noted herein, I have found that Lion has not shown that it has made meaningful changes in its business practices or structure since May 1999 that would obviate the need for suspension now.

Although defendant persuaded the court at argument that the Forman Declaration constitutes a legitimate supplementation of the administrative record insofar as it discusses the facts related to timing, the administrative record cannot be augmented by Mr. Forman's convenient and supervening rationale. To do so would transform an agency decision from a finite requirement that the agency articulate the basis for its action to a fluid defense that takes final form when an agency must answer in court. The Forman Declaration arguably puts forth a cogent, reasonable rationale for the suspension, to wit, that allowing plaintiff five contracts was acceptable because they were not large and a criminal investigation was proceeding; that when a large-volume contract appeared on the horizon, the time to take action was at hand; and that the agency obtained clearance from the OIG to proceed even though the investigation was still ongoing. The court's function is not to second-guess this rationale, nor does it presume to do so. However, Dr. Clayton set forth a different rationale, a rationale that is entirely consistent with the administrative record and therefore not amenable to this type of clarification. Indeed, Dr. Clayton's rationale for the basis of suspension is so different from that proffered by the Forman Declaration as to support an inference that Dr. Clayton's was contrived. Because the ultimate grounds for suspension were known and available to have been relied on, but were not, Mr. Forman's rationale cannot supplement or supplant that of Dr. Clayton.

### 3. Standard for summary judgment

Under RCFC 56.1 motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (finding dispute to be genuine if jury could find in favor of non-moving party). Having cross-moved, each party bears the burden of demonstrating entitlement to judgment, as well as the absence of issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548,

---

6. MR. LION: ... with the export program, which I think relates to this particular situation because in the letter that we received December 14, 2000 it alleged that we would come out oversubscribed to the export program.

 MS. CARROLL: Mr. Lion, I have to remind you that the suspension that we're discussing here today—the suspension letter contains the basis for the suspension and it is not the December 14, 2000 letter, which although it's already in the record is not the reason we're here today.

 MR. LION: Well, how could it be that it's not part of this?

 MS. CARROLL: I can only tell you that the suspension letter dated January 12, 2001 contains the basis for the suspension.

91 L.Ed.2d 265 (1986). When resolving a motion for summary judgment, the court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Jay v. Sec'y of HHS,* 998 F.2d 979, 982 (Fed.Cir.1993). A motion for summary judgment on the administrative record nonetheless differs from a motion for summary judgment because the latter's standards have little bearing on the review of the administrative record in a bid protest case. The inquiry, instead, is whether, given all the facts and even disputed facts, such as whether a specific score on evaluation was warranted, a protestor has met its burden of proof that an award is arbitrary and capricious. The standard of proof in a bid protest case is a preponderance of the evidence. *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988).

### 4. *Suspension of plaintiff*

Plaintiff's complaint alleges that the USDA violated the FAR when it suspended plaintiff because plaintiff's conduct did not affect its present responsibility to perform government contracts and also that the USDA violated both the FAR and due process in conducting the February 1, 2001 hearing.

■ Pursuant to the Tucker Act, 28 U.S.C. § 1491(b), the Court of Federal Claims has exclusive jurisdiction to review post-award bid protests. The court must set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure as required by law." 5 U.S.C. §§ 706(2)(A), (D); *see also RAMCOR Serv. Group, Inc. v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999) (explaining adoption of agency review standards into Tucker Act amendments). Under the "arbitrary and capricious" standard, the court may not substitute its judgment for that of agency officials. Rather, inquiry must focus on whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). When an

agency's responsibility determination is at issue, the court may set aside that decision if it violates a statute or regulation or it otherwise lacks a rational basis. *Impresa,* 238 F.3d at 1332–33.

According to FAR § 9.407–1(b)(1), "suspension is a serious action to be imposed on the basis of adequate evidence, pending the completion of investigation or legal proceedings, when it has been determined that immediate action is necessary to protect the Government's interest." A contractor may be suspended upon adequate evidence of "a lack of business integrity or business honesty that seriously and directly affects the present responsibility of the Government contractor or subcontractor." *Id.* § 9.407–2(a)(7). As a matter of policy, an agency may impose suspension "only in the public interest for the Government's protection and not for purposes of punishment." *Id.* § 9.402(b); *cf. Sloan v. HUD,* 231 F.3d 10, 17 (D.C.Cir.2000) ("There must be a *real need for immediate action to protect the public interest* in order to justify a suspension.").

■ Even assuming plaintiff's alleged conduct evidences "a lack of integrity or business honesty" so as to justify suspension, the court holds that Dr. Clayton abused his discretion when he determined that evidence of plaintiff's lack of integrity in April 1998, which was known to the agency as of May 1999, "seriously and directly" affected plaintiff's "present responsibility" as a Government contractor in February of 2001. The USDA awarded plaintiff five contracts between the completion of its investigation in May 1999 and its decision to suspend plaintiff in January 2001. The USDA statutorily was obligated to make an affirmative finding of plaintiff's responsibility before awarding each of those contracts. *See* FAR § 9.103(b); *Impresa,* 238 F.3d at 1334. In other words, five times between May 26, 1999, and February 1, 2001, the USDA itself affirmed that plaintiff's business practices met the standards for present responsibility. Significantly, by the USDA's own representations, it did so despite the possession of all the evidence that it would later use to suspend plaintiff. The court finds these facts dispositive of the issue of plaintiff's present responsibility.

That Dr. Clayton knew of the five interim contracts is demonstrated by their incorporation into the administrative record and by his reference to them in his final report and decision.[7] That he nevertheless concluded that suspension was immediately necessary to protect government interests, without pointing to any event as to the issue of immediacy, was arbitrary and capricious.

Defendant rejoins that the FAR's immediacy requirement was not violated in this case because of the separate, criminal investigation into plaintiff.[8] Defense counsel notes that the language of the FAR anticipates that a delay can occur in a suspension pending the completion of a separate investigation. Although it was not until litigation that the USDA sponsored the position that the suspension or its timing was related to the completion of the investigation or legal proceedings, Dr. Clayton did refer to the possibility of such an investigation in his final report and decision. In addressing the delay between the issuance of the USDA Report and the suspension, he conveyed that "[a]lthough the AMS Compliance Office's preliminary investigation report was completed in May 1999, that did not signify the completion of *all* of the federal government's investigation activities, and an earlier suspension of Lion could have had a detrimental effect on those activities." [9]

The court does not disagree with the proposition that "[t]here may be circumstances where substantial Government interests would be prejudiced even by a disclosure of enough facts to show 'adequate evidence' for the suspension." *Horne Bros., Inc. v. Laird,* 463 F.2d 1268, 1272 (D.C.Cir.1972); *see also Commercial Drapery Contractors, Inc. v. United States,* 133 F.3d 1, 7 (D.C.Cir.1998) (explaining that agency not required to disclose evidence at hearing if doing so would risk impairing ongoing criminal investigation and prosecution). Nevertheless, "the Government may not simply ignore the interests of the contractor." *Horne,* 463 F.2d at 1272. "While certainly the Government's interest in protecting an ongoing criminal investigation is great, this cannot extend to obdurate uncooperativeness where the suspended contractor's interest likewise is great." *ATL,* 736 F.2d at 685; *cf. Perkin–Elmer Corp. v. United States,* 47 Fed.Cl. 672, 676 (2000) (Government civil investigation did not justify delay between issuance of investigation report and decision to revoke acceptance of contract when defendant presented no other evidence explaining delay).

By repeatedly insisting in its final decision that every fact related to its decision to suspend plaintiff could be found in the USDA Report, the USDA belies an inference that any undisclosed facts related to the criminal investigation made its interest in suspending plaintiff more immediate in 2001 than it was in 1999.[10] At oral argument defense counsel maintained that the USDA did not want to alert plaintiff to the ongoing investigation. However, plaintiff knew of the criminal inves-

---

**7.** At oral argument defense counsel noted that nothing in the record indicates that Dr. Clayton actually had received the USDA Report prior to his initial decision to suspend in January 2001, thus raising the possibility that Dr. Clayton did not delay unduly in taking action two years after its publication. Setting aside the issue of whether Dr. Clayton should be charged with constructive knowledge of the USDA Report's findings, the undisputed fact remains that after the hearing Dr. Clayton knew when the USDA Report was published and knew about the five interim contracts awarded to plaintiff, but still upheld the decision to suspend.

**8.** The USDA has not divulged the details of that investigation to plaintiff or to the court.

**9.** After oral argument defense counsel filed a motion for leave to file notification of this administrative record citation on grounds that he had been unable to locate the citation during the hearing. Although the court already was versed in Dr. Clayton's report in general and this provision in particular, the court accepts defendant's motion for leave as a motion to file notification and grants it.

**10.** According to Mr. Forman, the Government's interest in suspending plaintiff became immediate solely because the Government was preparing to issue bids for larger raisin contracts. Assuming this to be the case, he does not state that the criminal investigation revealed new facts relevant to the suspension nor that an earlier suspension would have prejudiced that investigation. Rather, the delay occurred merely because it was the policy of the USDA not to suspend until completion of a criminal investigation. Dr. Clayton, however, gave no such explanation for the delay.

tigation as early as October 2000 when plaintiff's records were subpoenaed. Had the USDA suspended plaintiff during that time frame, plaintiff observes that it would have been able fully to challenge the suspension before the large-volume contract was let out for bids. Post-hearing, Dr. Clayton justified his decision solely on the ground that plaintiff had not made satisfactory changes to its business practices between 1998 and 2001 to warrant a finding that it was at present responsible, a conclusion undercut by each one of the USDA's interim determinations that plaintiff was indeed responsible at that time.

The court does not hold that the USDA's policy not to suspend a contractor until a criminal investigation is completed is arbitrary and capricious. Nor does the court hold that the USDA acted arbitrarily and capriciously because it timed so the suspension so as to preclude plaintiff from bidding on a large-volume raisin contract. The court must assess the decision to suspend as it was offered by Dr. Clayton. *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103 S.Ct. 2856. The court cannot sustain the rationale offered by Dr. Clayton because (1) his proffered reasons for plaintiff's suspension dealing with business practices were made irrespective of the size of the contract; (2) he cited no event bearing on plaintiff's responsibility that occurred between the award of the five contracts and the decision to suspend; and (3) his administrative decision did not mention as justification any concerns about the size of the contracts as to which plaintiff would be precluded from bidding. The palpable wrong suffered by plaintiff is that the USDA gave plaintiff one, apparently at least partially contrived, explanation for the decision to suspend when nothing precluded it from releasing the actual basis for suspension to plaintiff. Plaintiff therefore was forced into court to obtain a valid explanation of the USDA's action, an explanation that the agency could have provided in its final decision. Plaintiff should not have to pay for that right. Similarly, the agency's delay in instituting the suspension in this case disadvantaged plaintiff in its attempt to challenge the suspension.

The court holds the USDA acted arbitrarily and capriciously by deeming plaintiff both responsible and non-responsible for the same time period and based on the same evidence. Moreover, the suspension appears to be in the nature of punishment because the USDA does not deny that, although it believed plaintiff to be responsible between May 1999 and December 2001, it suspended plaintiff solely for conduct of which the USDA was apprised fully in May 1999. Plaintiff therefore is entitled to summary judgment in its favor on its claim that the USDA acted arbitrarily and capriciously when it effectuated the suspension.

5. *The February 1, 2001 hearing*

The FAR requires that administrative hearings comport with due process notions of "fundamental fairness." FAR § 9.407–3(b); *see also Doty v. United States,* 53 F.3d 1244, 1251 (Fed.Cir.1995) ("When procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion."). Plaintiff contends that its due process rights were violated during the February 1, 2001 proceeding because (1) it was not afforded discovery prior to the hearing; (2) it was not afforded the opportunity to cross-examine the USDA's witnesses; (3) Dr. Clayton, the suspending official, was also the hearing official; and (4) Dr. Clayton refused to address the issue of whether plaintiff presented an immediate threat to the public and/or overlooked substantial changes made by plaintiff in its operations since 1998. As this last allegation was adequately addressed and discussed in plaintiff's argument that Dr. Clayton abused his discretion when he upheld plaintiff's suspension, the court limits its discussion to the other three alleged procedural defects.

█ In the context of government contracting, "[t]he minimum requirements of due process are notice and an opportunity for hearing appropriate to the nature of the case." *Transco Sec., Inc. of Ohio v. Freeman,* 639 F.2d 318, 321 (6th Cir.1981) (citing *Boddie v. Conn.,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971)). FAR § 9.407–3(b)(1) requires the USDA to "afford the contractor

**250**

... an opportunity, following the imposition of suspension, to submit, in person, in writing, or through a representative, information and argument in opposition to the suspension." The FAR's due process requirements have been deemed satisfied when the contractor has been provided all of the information relied on by the suspending official. *Electro–Methods, Inc. v. United States,* 728 F.2d 1471, 1476 (Fed.Cir.1984).

▬ Defendant argues, and the court agrees, that the February 1, 2001 hearing complied completely with the FAR. Plaintiff was provided a copy of the redacted portion of the USDA Report, which was the sole information relied on by the suspending official. Moreover, plaintiff was afforded an opportunity to show that the suspension nevertheless should not have been imposed. Plaintiff does not dispute these conclusions, but, instead cites FAR § 9.407–3(b)(2), which plaintiff claims gave it more substantive rights at the hearing:

> In actions not based on an indictment, if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the suspension and if no determination has been made, on the basis of Department of Justice advice, that substantial interests of the Government in pending or contemplated legal proceedings based on the same facts as the suspension would be prejudiced, agencies shall also—
>
> (i) Afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents. . . .

Plaintiff would apply this provision to the February 2001 hearing because there existed "a genuine dispute over the facts material to the suspension," but the USDA refused to provide further documents or witnesses.

According to the plain language of this provision, whether there exists a genuine dispute over the facts material to the suspension is a determination made by the agency only after the contractor presents its evidence against suspension. In other words, plaintiff could not determine unilaterally that there existed a genuine issue of fact material to the suspension so as to invoke these rights before the hearing actually occurred. The

facts do not establish whether the USDA convened the February 2001 hearing in this case because it believed that plaintiff's submission created such a genuine issue. Further, plaintiff cites no cases that discuss when a contractor creates a genuine issue of fact so as to invoke the rights afforded by FAR § 9.407–3(b)(2). The court notes that at least one case plaintiff cites for another proposition could also be interpreted as allowing for the possibility that a plaintiff may create a genuine issue of material fact prior to a hearing so as to invoke a similar debarment provision. *See Robinson v. Cheney,* 876 F.2d 152, 161 (D.C.Cir.1989). In *Robinson* the D.C. Circuit held that a contractor, who merely denied awareness of improper conduct, did not create a genuine issue of material fact in its submissions to an agency so as to invoke the procedural rights of the FAR's debarment provision. As in *Robinson* plaintiff merely asserts that a genuine issue of material fact existed because it openly "disputed" the charges prior to the hearing. But its pre-hearing submissions to Dr. Clayton and others at the USDA proffer no evidence directly refuting the findings embodied in the USDA Report. Plaintiff only represented that it was not aware of any improper conduct, a representation repeated by Mr. Lion during the hearing. The court therefore is left to conclude, as the *Robinson* court did, that, if plaintiff could invoke these FAR provisions before the hearing, they did not apply because plaintiff had not established the requisite issue of material fact.

Finally, plaintiff makes no specific argument to the effect that Dr. Clayton's role as both hearing official and suspending official violated the FAR or was otherwise inappropriate to the nature of the hearing. The court thus has no basis to conclude as a matter of law that plaintiff's due process rights under the FAR were violated by the procedures followed at the February 1, 2001 hearing. As a consequence, plaintiff's motion for summary judgment on this aspect of plaintiff's claim must be denied. Because plaintiff does not dispute that the hearing complied with its due process rights as embodied in FAR § 9.407–3(b)(1), defendant's motion for summary judgment is granted.

### 6. *Plaintiff's claim for lost profits*

Plaintiff seeks lost profits on a theory of breach of implied-in-fact contract, alleging jurisdiction pursuant to 28 U.S.C. § 1491(a)(1). Defendant correctly notes that the court's jurisdiction over this bid protest action instead derives from 28 U.S.C. § 1491(b), which states:

(1) Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on any action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or to the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.[11]

(2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.

This provision, introduced as an amendment to the Tucker Act in 1996, expanded the scope of the Court of Federal Claim's judicial review of bid protests and eliminated the need to construe post-award bid protests as implied-in-fact contracts brought pursuant to section 1491(a)(1). *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1079–80 (Fed.Cir.2001); *Impresa,* 238 F.3d at 1332; *see also CCL Serv. Corp. v. United States,* 43 Fed.Cl. 680, 687 (1999) (explaining that enactment of Tucker Act amendment granting jurisdiction over bid protest claims superseded the "fiction" of the implied-in-fact theory). Section 1491(b)(2) of the Tucker Act limits plaintiff's recovery on its bid protest action to its bid proposal costs, and plaintiff cannot recover more by pleading

its cause of action as an implied-in-fact contract under section 1491(a)(1), even if, on the facts, it can show that it likely would have been the successful bidder. Defendant's motion for summary judgment on this aspect of plaintiff's claim must be granted.

The court is sympathetic to the fact that none of the parties to the action in the Fresno district court realized that court's lack of jurisdiction in that matter until almost eight months into litigation. In has been said that "[j]urisdiction in this Court to consider an agency decision to debar a contractor has so far been found appropriate, within carefully defined limits, only in the context of affording complete relief in bid protest claims." *Medina Constr. v. United States,* 43 Fed.Cl. 537, 557 (1999). Whether section 1491(b)(1) can provide plaintiff with "complete relief" for the wrong it has suffered is an open question. If plaintiff has a legal argument that its surviving claim can be framed to recover more than plaintiff's presumably minimal bid protest costs, the court grants it leave to so amend its complaint.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion filed on November 30, 2001, to strike plaintiff's reply to defendant's response to plaintiff's proposed statement of uncontroverted facts is denied.

2. Plaintiff's November 21, 2001 motion for a preliminary injunction or a temporary restraining order and plaintiff's December 12, 2001 motion for leave to file additional evidence are denied as moot.

3. Defendant's motion filed on October 15, 2001, to strike the declarations of Bruce Lion and Brian C. Leighton is denied.

4. Plaintiff's motion filed on November 15, 2001, to strike the declaration of Eric M. Forman is granted as to ¶¶ 4–9 and otherwise denied.

5. Plaintiff's motion for summary judgment filed on August 28, 2001, on its claim

---

**11.** The district courts' jurisdiction over bid protest actions terminated on January 1, 2001. Administrative Dispute Resolution Act of 1996,

Pub.L. No. 104–320, § 12(d), 110 Stat. 3870, 3875.

that its suspension was arbitrary and capricious is granted insofar as it alleges a violation of FAR § 9.407–1 and otherwise denied.

6. Defendant's cross-motion for summary judgment filed on October 15, 2001, on plaintiff's claim for lost profits and plaintiff's claim that the procedures at its suspension hearing violated FAR § 9 .407–3 is granted and otherwise denied.

7. Defendant's motion for leave to file notification of administrative record citation filed December 10, 2001, is granted, and the notification is filed this date.

8. Plaintiff is granted leave to file an amended complaint by December 28, 2001. Plaintiff's pending amended complaint is returned unfiled.

9. The parties shall file a Joint Status Report by January 8, 2002, proposing a course for further proceedings.

10. The court's chambers this date transmitted a copy of this opinion to counsel by facsimile transmission.